CAMPBELL SOUP COMPANY,
Plaintiff,

v.

Robert L. DESATNICK, Defendant.

Robert L. Desatnick, Plaintiff,

v.

Campbell Soup Company, Defendant.

Civ.A.No. 99–1716 (JBS).

United States District Court,
D. New Jersey.

July 8, 1999.

Mary A. Laughlin, Michael A. Schwartz, Dechert, Price & Rhoads, Princeton, NJ, for Campbell Soup Co.

John P. Quirke, Wolf, Block, Schorr &Solis–Cohen LLP, Camden, NJ, for Robert L. Desatnick.

## OPINION

SIMANDLE, District Judge.

This matter is before the court on the motion of Robert L. Desatnick ("Desatnick") for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a), enjoining Campbell Soup Company ("Campbell") from enforcing a 1997 non-competition agreement to prevent Desatnick from accepting an offer of employment from The Pillsbury Company ("Pillsbury"). Desatnick, who resigned from his position as Campbell's Vice President of Global Advertising and Promotion on April 8, 1999, argues that Campbell has no legitimate business interest in preventing him from joining Pillsbury as Chief Marketing Officer of Pillsbury North America because he does not possess any proprietary secrets or confidential information that require protection. Desatnick also contends that the non-competition agreement is unenforceable because (1) Campbell breached an oral contract of employment when it required him to execute the non-competition agreement and did not provide him

with any additional valuable consideration in exchange for his promise not to compete, and (2) he executed the non-competition agreement under economic duress. The court has carefully considered the testimony and voluminous exhibits received into evidence at the hearing on June 18–19, 1999. Because the court finds that Desatnick has not met his burden of demonstrating likelihood of success on the merits at trial, the court denies Desatnick's motion for a preliminary injunction.

## FINDINGS OF FACT

*Desatnick's Advertising Agency Background*

From 1979 to 1994, Desatnick worked for an advertising agency, first as an account executive and then as a member of the agency's management team. For the last four years of his employment with this agency, Desatnick managed the Campbell account. (Campbell Ex. 1.)

In early 1994, Desatnick was offered a lucrative position by another advertising agency. In February 1994, when it learned that Desatnick was considering leaving his agency position as manager of the Campbell account for a position with another advertising agency, Campbell inquired whether Desatnick would be interested in joining Campbell in an in-house capacity. Thereafter, Desatnick and Gary Moss, then Campbell's Vice President of Global Advertising, engaged in a series of discussions about Campbell's ability to offer a compensation package that was competitive with the offer Desatnick had received from the advertising agency.

*Desatnick Joins Campbell*

Ultimately, Campbell extended Desatnick an offer of employment as Director— Advertising Services. The terms of Campbell's offer were set forth in a February 25, 1994 letter. (Campbell Ex. 4.) The offer letter provided that Desatnick was to be paid a base salary of $140,000, a one-time signing bonus of $20,000, and standard medical and dental benefits. (*Id.*)

The offer letter further provided that Desatnick would be eligible to participate in a short-term management incentive program and a long-term executive stock option program. (*Id.*) Finally, the offer letter reflected Campbell's commitment to provide some financial assistance with Desatnick's relocation expenses. (*Id.*) The terms of Desatnick's employment were governed by the February 25, 1994 letter and its attachments, and nothing therein promised Desatnick that he would receive stock options, let alone that he would receive a specified amount of such options. If Desatnick had formed any impression from Moss' prior oral statements that stock options were promised or guaranteed, these written materials defined the terms of his employment and contained no such promise or guarantee.

Desatnick signed Campbell's confidentiality agreement as he started employment in 1994, entitled the "Patent—Trade Secret Agreement," dated April 4, 1994, promising to keep confidential, both during and after his employment, such information as "confidential marketing plans or data" and "potential new product introductions." (Campbell Ex. 8.) He testified that he refused to sign the "Employee Agreement Relating to Confidential and Proprietary Information" that contained a non-competition clause in 1994. He told Gary Moss he would be unable to sign the non-competition agreement based on advice of his attorney with whom he had reviewed the matter. Desatnick thus began work at Campbell with a signed trade secret agreement but no non-competition agreement. He received 1,800 stock options for 1994 and 2,400 stock options for 1995, consisting of the standard level of 1,800 plus 600 for a superior performance rating.

Under Campbell's long-term executive stock option program, Desatnick and other employees at or above job level 30 (Desatnick started at job level 38) were eligible to receive stock option grants that vested over a three-year period following the grant date. (*See* Declaration of Sarah

Armstrong at ¶ 4.)[1] The awarding of stock option grants under the program involves a two step process. First, the Compensation and Organization Committee of the Board of Directors ("the Compensation Committee") decides whether stock options are to be awarded at all in a given year and, if so, determines guidelines for the awarding of such grants, including the number of stock options that may be granted for each particular job level. (*Id.* at ¶ 5.) If options are to be awarded, then each eligible employee's supervisor recommends the number of options that employee should be awarded based on his or her performance and the guidelines established by the Compensation Committee. (*Id.* at ¶ 6.) The stock option program does not obligate Campbell to make an award nor does it entitle an employee to an award; stock options awards are made at the discretion of the Compensation Committee and future awards may be terminated or changed at the sole discretion of Campbell. (*Id.* at ¶ 5.)

A stock option contains a "strike price," which is the price at which a share of Campbell's stock can be purchased if the employee chooses to exercise the option at a future date. If the price of the stock falls to a level below the "strike price," the option becomes essentially worthless, since the employee could purchase the stock at a lower price on the open market. If the price of the stock rises to a level exceeding the option price, the option has value roughly in proportion to the savings in purchase price that it enables the employee to recognize if the employee exercises the option. Thus, when Desatnick was weighing the competing offer of employment from FCB/Leber King, Desatnick testified that part of that offer was for a fixed allotment of 1,000 stock options, which he regarded as a valuable promise exceeding the value of Campbell's offer.

Whether the FCB stock options would have any value compared with Campbell's would be based upon the stock's performance. (As a matter of fact, in hindsight, FCB's stock options proved to have little value due to poor stock performance, according to indications in the testimony.)

In any event, Desatnick received Campbell stock options in 1994 and 1995, pursuant to the 1984 Long–Term Incentive Plan, as amended May 27, 1993 (Campbell Ex. 52).

Desatnick signed another "Employee Agreement" in December, 1995, promising not to "divulge, use or appropriate for [his] own use or for the use of others ... any trade secrets or other secret or confidential information or knowledge obtained by me during my employment." (Campbell Ex. 9.) "Trade secrets" were broadly defined to include information concerning business plans, financial information, strategic plans, advertising and marketing plans, pricing methods, and business relationships. (*Id.*)

*The 1996 and 1997 Non–Competition Agreements*

In June of 1996, Campbell asked all executives at Desatnick's level to sign a "Confidential and Proprietary Information Agreement" ("the 1996 agreement") that included a non-competition clause in consideration for being eligible for a discretionary grant of stock options, under a policy approved by the Compensation Committee of Campbell's Board of Directors. (Campbell Ex. 11.) The accompanying letter (Campbell Ex. 10), dated June 5, 1996, explained that Campbell sought to protect the company's proprietary and confidential information, and that Campbell sought to share competitively sensitive information with the entire management team, including corporate goals,

---

1. The Campbell Soup Company plan and brochure relating to stock options in effect as of February 25, 1994, which would have been supplied to Desatnick as part of Campbell's offer of employment, confirm the highly discretionary nature of the existence and amount of any such award. (See Campbell Ex. 71, Supplemental Decl. of Sarah Armstrong dated June 18, 1999, and attachments thereto.)

strategic facts and plans. (*Id.*) The 1996 agreement provided essentially that an employee having access to this sensitive information could not thereafter leave Campbell's employment to join a competitor, and that Campbell's would pay a departing employee up to 75% of base salary until suitable new employment with a non-competing company could be found.

Desatnick testified that he was told that if he didn't sign the 1996 agreement, he would not receive stock options. It would also follow that he would not be permitted to share in the sensitive competitive information and strategic plans which the 1996 agreement sought especially to protect. He went to Campbell attorney Cary Metz to complain, telling Metz he assumed it was a mistake because former Vice President Gary Moss had agreed, two years earlier, that Campbell couldn't require Desatnick to sign a non-competition agreement, and that Campbell had promised to pay Desatnick the stock options nonetheless. Metz reiterated that Campbell's Compensation Committee had determined it would require Desatnick to have a non-competition agreement like other top executives in the company.

Campbell gave Desatnick and the other recipients of the letter about 30 days to respond, the deadline being July 8, 1996. Desatnick did not consult with counsel and, although he was angry and unhappy, he signed the 1996 non-competition agreement on June 28, 1996 (Campbell Ex. 11).

Desatnick's 1996 stock options increased, as he was awarded at least 5,287 from the 1996 program (Campbell Ex. 18), which was adjusted to 8,813 options to reflect a 2:1 stock split and an approximate 10% adjustment reflecting spin-off of the Vlasik pickle subsidiary. When he exercised the 5,287 options from 1996 on January 7, 1999, Desatnick realized a profit of $115,000. (*Id.*)

Factually, Desatnick's claim of duress in signing the 1996 agreement does not pan out. Although he felt he would be fired if he did not sign the 1996 agreement, no one ever communicated such a threat orally or in writing.[2] He chose not to consult with an attorney (despite his alleged 1994 consultation with counsel about the same subject) and he chose to sign the agreement several weeks before it was due, allegedly because he was departing the next day on a European trip. He also never asked for an extension of time to make up his mind, and he conceded that during his worldwide travels, whether on vacation or on the job, he is seldom out of touch with the home office for long; he easily could have continued the dialog if he felt it necessary to do so above attorney Metz' level, but he did not do so. He complained to no one but Metz.

In any event, his employment not only continued after he signed the 1996 agreement, but his compensation increased and he received a promotion on September 1, 1996 to Vice President of Global Advertising and Promotion, at a base salary of $156,000. (Ex. 21.) Together with the 1996 stock options themselves, the increases in salary and rank were further consideration for his signing the 1996 agreement.

Much of Desatnick's quarrel with the 1996 agreement—although lacking merit for reasons explained in this Opinion—is entirely beside the point. Campbell is not seeking to enforce the 1996 agreement but rather, the substantially different and (from the employee's perspective) improved "Nonqualified Stock Option and Non–Competition Agreement" that he signed without audible protest on July 25, 1997 ("the 1997 agreement"). (Campbell Ex. 13.) The 1997 agreement provides that during Desatnick's employment with Campbell, and for 18 months after such employment (if he leaves voluntarily), he agrees not to become employed by any

---

**2.** In fact, Desatnick testified that Metz told him that no one was making him sign the 1996 agreement, but he needed to sign it if he wanted to be eligible for certain stock options in 1996.

business that competes with the business of Campbell in any part of the world. (*Id.* at ¶ 7(a)). A business "competes" if it "engages in, or plans to engage in, the production, marketing or selling of any product or service . . . which resembles or competes with a product or service of Campbell Companies . . . during [the employee's] employment [with Campbell]." (*Id.* at ¶ 7(b)).

The 1997 agreement, quite significantly in this court's view, also provides a "safety net" in case Desatnick is unable to find employment with a non-competitor. Campbell agrees in this safety net to pay 100% of his base monthly salary (along with medical and dental benefits) beginning 90 days after his last employment at Campbell's and continuing for the 18–month duration of the non-competition provision or until he finds a suitable position, if sooner. (*Id.* at ¶ 8.) The 1997 agreement also evidences Desatnick's acknowledgment that "the restrictions in this agreement are necessary to protect the legitimate interests of Campbell Companies, and impose no undue hardship on [him]." (*Id.* at ¶ 10(a)). This "safety net" in the 1997 non-compete agreement provides a reasonable financial cushion to soften the financial impact of the executive employee's job search with a non-competitor for a reasonable period of time. The 18–month period is reasonably long in recognition that senior executive opportunities may not be easy to obtain overnight.

Meanwhile, Desatnick's base salary as a corporate Vice President continued to increase, reaching $185,000 as of January 1, 1999. (Campbell Ex. 21.) Campbell granted Desatnick 4,488 stock options in June 1997, and 3,500 more stock options in 1998, which have not yet vested. (Campbell Ex. 17).

*Desatnick's Exposure to Highly Sensitive Competitive Information*

Throughout the hearing, Desatnick sought to minimize his duties in terms of exposure to strategic planning information, and he also sought to trivialize the competitive importance of the information that he received in the course of his duties. In fact, for the past two-plus years, Desatnick was a member of Campbell's Leadership Group, consisting of about 40 senior Campbell executives who meet on a monthly basis to discuss strategic planning, financial performance, financial forecasting, and resource allocations. Although Desatnick was not a member of the even more restrictive Senior Leadership Team consisting of a handful of the top executives, he was part of the important management team that planned and reviewed the company's performance.

Lisa Zakrajsek, Campbell Soup's Vice President of U.S. Soup, testified that the Leadership Team—of which she is a member—as consisting of very senior corporate officers who meet and communicate regularly with Campbell's CEO Dale Morrison to discuss how critical issues are being handled in the company. More detailed financial performance and projections are reviewed at the level of Campbell's various business components, in contrast to the generality of the corporate-level figures and documents that are released to financial analysts and shareholders. The monthly meeting topics are generally confidential including options under consideration by the Board or reasons for decisions made by the Board.

As explained by Ms. Zakrajsek, whom I find to be credible and candid, corporate and sub-corporate level strategic planning is a key part of the duties of the Leadership Group, including Desatnick. Significantly, the corporate strategic planning extends for three years into the future, and the plan is revised annually and superseded by the next three-year plan, with the commencement of the new fiscal year each August 1st. The FY 2000 strategic plan, for example, began its planning phase in September, 1998 as FY 1999 final results were being received. Reviewing strengths and weaknesses of the Campbell businesses, the FY 2000 planning issues

emerged.[3] Desatnick attended meetings pertaining to soup strategies from November 1998 through January 1999, including sensitive strategy sessions with CEO Morrison in which Campbell embarked on a new direction in an important aspect of its advertising (which cannot be discussed further here due to its trade secret status). In this connection, Desatnick provided a thorough analysis of Campbell's past advertising containing not only how various ads scored with consumers or consultants but also insights into what worked well and poorly for the various brands. The group formulated the FY 2000 strategies in December and January, including plans for positioning brands in the competitive market, resource allocations within the company, and pricing strategies. He has become aware of internal information regarding Campbell's brands' strengths and vulnerabilities, and what strategies work and don't work in the highly competitive marketplace for the grocery consumer.

Some of the results of the FY 2000 strategic plan are unfolding now and in the near future. Some new products, for example, are already on Campbell's Web site, and the new products will be shipped this summer to grocers for shelving before the advertising campaigns of October '99 through February '00. Campbell's national sales force has received, in May, a thick briefing book to assist them in selling Campbell's products, including new products. (Desatnick Ex. E). The book contains information about the targeted consumer groups, but it does not discuss the upcoming advertising campaigns, even though there will be a complex shift in advertising, according to Zakrajsek's testimony. Although the National Sales Force book (Desatnick Ex. E) is rich in details and tips for increasing sales of the featured products, these details are not the type of confidential information Campbell seeks to protect, nor could it do so anyway since those materials are in the hands of the national sales force which numbers about 650 persons. The secrets that lie behind the advertising plan, and which are known to Desatnick and others in top management, are the sources of profitability, vulnerabilities of the brands, what has been learned from successes and failures, and what is to happen in the medium-range future after the new advertising strategy takes shape. Thus, for example, the new wholesale prices are printed already in the salesman books (*see id.* at CSC 06706), but how that price was determined and the marginal rates of consumer acceptance at various price points are not.

A second sales force book, the FY 2000 Customer Planning Guide (Desatnick Ex. P), was also distributed in May at the same time as Desatnick Ex. E, above, including some information about the sales planning calendar for August '99 to July '00. Test results on some brands are disclosed as a sales technique for new products (*see* Desatnick Ex. E at 06524 and 06528, for example), and some sales presentation materials can be downloaded by the sales force in a Power–Point format as of April 30, 1999. (*Id.* at 06538.)[4]

3. Desatnick had received the soup-products related draft of the current three-year strategic plan. As of early April, 1999, the strategic plan contained extremely sensitive competitive information, detailed in Callahan Aff. ¶ 13. Mark M. Leckie, Campbell's President, U.S. Grocery Division, indicated that this plan was first presented to the Board at its March meeting (Leckie Tr. at 41).

4. There is substantial new information that has not even been revealed yet to the sales force, according to the testimony of Mark M. Leckie, President of Campbell's U.S. Grocery Division. For example, whether some new products have not undergone consumer testing, what the commercials will look like, three of the six new trademarks, have been disclosed to no sales force member or financial analyst. (Leckie Tr. at 21–29, 91–96.) At one point, Mr. Leckie was unsure whether Desatnick had access to the strategy for positioning of Pace salsa products. (*Id.* at 28:3–8.) It appears that Desatnick did, since Ms. Puoti testified she discussed the Pace Positioning Final Presentation (Campbell Ex. 62) with Desatnick, leading to Pace's six-month advertising campaign to debut in September, 1999.

Mr. Desatnick asserts that the information he learned as Vice President is no longer confidential because Campbell executives disclose it to financial analysts, which in turn publish news of some upcoming developments and projections in newsletters to stock brokerage clients. Such analyst reports from brokers such as Salomon Smith Barney, Merrill Lynch, and others are in evidence. (*See* Desatnick Exs. W–Z and AA, BB and CC.) These financial analysts report their assessments of Campbell as an investment, based upon the data that can be gleaned through such information as is available, including in some instances meetings or interviews with CEO Dale Morrison and others. (*See, e.g.,* Desatnick Ex. W.) These brochures contain assessments and guesses and not the strategic planning that lies behind such developments. On various topics, Campbell refused to disclose further information to the analysts. The overall impression is that sketchy information has been made public regarding future plans and strategies, without disclosing the core confidentially planning and strategic information underlying it.

By focusing on these tidbits of information, Desatnick avoids the larger picture and the truly valid concerns of Campbell that his job at Pillsbury is exactly what is reasonably precluded by the non-competition agreement.

As Vice President—Global Advertising and Promotion, Desatnick was, according to his own curriculum vitae (Campbell Ex. 1), responsible for overseeing Campbell's $380 million global advertising, licensing, and corporate promotion budget, with monthly responsibilities for all Campbell Soup products worldwide, the sales of which total $8 billion. (*Id.*) His functions included "brand positioning, creative strategy, advertising and promotion campaigns, Campbell's Web site, corporate licensing, and media planning, buying, and research. (*Id.*) He performed these jobs through managing a 45-member staff." (*Id.*) In addition, according to his description of his own position (Campbell Ex. 23), he was responsible for, among other things, developing creative strategies for all advertising initiatives and "managing the media process (including improving plan quality via proprietary research techniques)." It is rather telling, in my view, that even though he acknowledged his responsibility for "proprietary research techniques" for effective advertising, he does not consider such information "confidential."

Examples of his personal involvement in these lines of proprietary endeavor include attending, in February 1999, sensitive meetings with a consultant about a key (confidential) aspect of Campbell's outside advertising and quality, and attending in January 1999 a confidential meeting of Campbell executives and its advertising agencies in which aspects of the three-year plan were introduced behind closed doors with no copies being distributed, as testified to by Zakrajsek.

Further, Campbell's present Director of Global Advertising Services, Maria Puoti, testified how she worked with Desatnick to develop the brand positioning statements for various Campbell brands including Chunky Soups, Pepperidge Farm products, Pace salsa products, Healthy Request foods and other items. Development of brand positioning statements is a confidential, competitively sensitive process involving defining what the company wants each particular brand to stand for in the marketplace. Puoti and Desatnick also developed a training program—the Marketing Career Development Program—of which he obtained the current revision in January or February of 1999. Although Puoti had direct responsibility for Pepperidge Farm advertising concepts and working with the Pepperidge Farm advertising agency, she testified that Desatnick has reviewed proposed "story boards" for eleven different commercials, which were then culled down to three, which are not due to be released until October, 1999 through January, 2000, reflecting new brand positioning for these products.

In short, whether Mr. Desatnick admits it or not, he has been privy to some of the most guarded corporate strategic secrets over the past two years, including much that is not public and may never become public.

*Competition Between Campbell and Pillsbury*

Since Campbell seeks to invoke the 1997 agreement's non-compete clause, it is necessary to determine whether Pillsbury is a manufacturer and marketer of significantly competitive products. Desatnick points to some internal Campbell documents that do not list Pillsbury as a chief competitor against various lines, such as Campbell's Pepperidge Farm brands. (Desatnick Exs. F, G & H, and Ex. V at 0844.) It is clear, on balance, that Pillsbury is a significant competitor of Campbell in soups and Mexican salsa products, among others. Campbell considers Pillsbury's Progresso Soup brand as its principal domestic soup competitor. (*See* Callahan Tr. at 10). In fact, Pillsbury regards Campbell as its principal soup competitor, as Pillsbury recently launched a large advertising campaign expressly presenting its Progresso soup as a superior alternative to Campbell's. Desatnick in fact participated this year in formulating Campbell's plan to combat Progresso's advertising initiative, during the time when he was interviewing for the Pillsbury CMO position. Campbell's Chunky Soup is a direct competitor of Progresso Soup. (*Compare* Campbell Exs. 84A & 84B.)

Campbell's Pace-brand Mexican salsa products compete directly with Pillsbury's Old El Paso products (*compare* Campbell Exs. 83A & 83B); Desatnick was not only ultimately responsible for Pace's creative advertising, he helped design the Pace initiatives for the coming year. (Campbell Ex. 62.) These confidential initiatives include concepts being pursued and being dropped, and positioning recommendations being pursued at this time. (*Id.*)

Campbell's Pepperidge Farm products and baked goods compete, at least indirectly, with Pillsbury's in such areas as garlic bread (*compare* Campbell Exs. 75A & 75B), Pepperidge Farm white bread by the loaf vs. Pillsbury refrigerated White Loaf and Crusty French Loaf (*compare* Campbell Exs. 73A, 73B & 73C); Pepperidge Farm's Apple Turnovers vs. Pillsbury refrigerated Apple Turnovers (*compare* Campbell Exs. 76A & 76B), and other cookie, cake, and pie pastry products in which a consumer could choose between the Pepperidge Farm pre-baked variety vs. Pillsbury's ready-to-bake refrigerated or frozen variety (*compare* Campbell Exs. 77A & B, 78A & B, 79A & B, 80A & B, 81A & B, and 82A & B).

It suffices to say that Pillsbury and Campbell are competitors in many product areas, and are direct and strenuous competitors in the huge markets for soups, salsas, and baked goods.

*Desatnick's Proposed Duties at Pillsbury*

Desatnick seeks to accept the offer of a "once-in-a-lifetime" opportunity with Pillsbury to become the Chief Marketing Officer. This position, reporting to the President of Pillsbury North America, includes responsibility for advertising and creating strategies for brand acceptance of Pillsbury's products, including those that compete with Campbell's brands in which Desatnick has sensitive competitive and trade secret information, such as Pillsbury's Progresso Soups and Old El Paso salsa products and Pillsbury refrigerated dough products. He points out that only two of the 44 food and beverage manufacturing companies listed in the Fortune 1000 have a Chief Marketing Officer. The position is described in the position specification of the Korn/Ferry International Personnel Agency coordinating the search. (Campbell Ex. 33.)

In November, 1998, Desatnick felt his duties at Campbell were being compressed and he sought new challenges elsewhere. He met with Pillsbury officials about this position in New York in December, 1998, and met with Pillsbury's Kathleen McAr-

dle in Minneapolis to discuss the position in detail on February 19, 1999. (This latter trip happened while en route to Los Angeles on Campbell business involving Walt Disney company.)

Mr. Desatnick followed up · on those interviews with letters to McArdle on February 25, 1999 (Campbell Ex. 45) and March 2, 1999 (Campbell Ex. 43). The latter helped Pillsbury to define the Chief Market Officer's roles and Desatnick's expectations, such as through achieving "new levels of excellence in the effectiveness and efficiency of the company's marketing activities," "creating broader experiential platforms that will let Pillsbury reach out to and surround the consumer in a seamlessly integrated fashion," and "leading the drive to create a world class marketing organization by enhancing Pillsbury's processes for recruiting, training, developing, evaluating, and promoting marketing personnel." (Campbell Ex. 43.) He proposed to accomplish these aims through, among other things, "participating in decisions about brand positioning, strategy, execution and marketing staff," and he enclosed a summary of his ideas for how he would do this, including defining the "Key Roles & Initiatives" and the proposed revised organization structure for Pillsbury's advertising and business development functions. (*Id.*)

On March 16, 1999, Pillsbury's President extended an offer to Desatnick to become the Vice President, Marketing, conditioned upon Desatnick's demonstration that the Campbell Non–Competition Agreement does not apply to his acceptance of this position, such as by a written waiver by Campbell. (Campbell Ex. 44.) This offer was revised on March 26, 1999 to change

the position title to Chief Marketing Officer, and it was again contingent upon the non-applicability of the Non–Competition Agreement. (Campbell Ex. 45.) The offer would expire on May 15, 1999. (*Id.*) Pillsbury apparently agreed to hold the offer open for a longer period to see whether the dispute regarding the non-compete agreement could be resolved in this litigation.[5]

Desatnick accepted Pillsbury's offer even though he had not sought or obtained Campbell's waiver (*see* Campbell Ex. 50), and Pillsbury reiterated on April 14, 1999 that Desatnick's acceptance was not consistent with Pillsbury's conditional offer. (*Id.*) Correspondence between the respective corporate counsel's offices of Campbell and Pillsbury confirmed that Desatnick had not disclosed to Campbell the conditional nature of Pillsbury's offer when he gave notice of his resignation from Campbell. (Campbell Exs. 47, 48 & 49.)

Desatnick has proposed that his new duties at Pillsbury could be temporarily scaled back and carved out to exclude responsibilities for marketing and advertising of Progresso and Old El Paso brands until Campbell's advertising campaigns are launched to the public. He points out that Progresso and Old El Paso comprise less than 6% of Pillsbury's sales overall, and that his new CMO duties could be temporarily restricted to the other dominant parts of Pillsbury's business. (Desatnick Br. at 2 n. 2.) Under this temporary restructuring of the Pillsbury Chief Marketing Officer position, according to Desatnick, he would be unable to aid these competitive endeavors even if he possessed Campbell's secret information and plans for these products, which he denies.[6]

5. Although it was reported in a post-hearing telephone conference call between counsel and the court on June 28, 1999 that Pillsbury was withdrawing its offer, the court was urged to continue to regard this as a live controversy since a result favorable to Desatnick could cause Pillsbury to renew its offer to him. The court continues to regard this matter as a live controversy pertaining not

only to the Pillsbury offer but also to Mr. Desatnick's efforts to find other employment at this time. Injunctive relief against the operation of the non-compete agreement could enable Desatnick to pursue and accept employment with other Campbell competitors, if granted.

6. When Pillsbury's refrigerated . dough products are included, however, as products

There is no evidence that such a segmentation of duties would be acceptable to Pillsbury or that it would work in practice. First, when Pillsbury has expressed itself, it has repeatedly sought proof of Campbell's plenary waiver of the non-compete clause as it applies to the entire Chief Marketing Officer position, without reference to segmentation or balkanization of the duties of the CMO position. (*See* Campbell Exs. 44, 45, 48, 50.) That is understandable, since the Pillsbury CMO position is expressly designed to integrate, across-the-board, the marketing strategy and its implementation through coordination of efforts in advertising, promotions, and packaging design across the entire brand portfolio for Pillsbury's North America's unit's $4.4 billion in sales. (Campbell Ex. 33.)

Second, to insulate Desatnick at Pillsbury from duties dealing with Progresso, Old El Paso, and Pillsbury cookie and pastry products would require a great measure of trust that he could comport his conduct to the requirements of the non-compete clause. Campbell has demonstrated a sound basis for questioning whether such trust would be warranted. Although it is undisputed that he is bound by the 1995 "Employee Agreement" (Campbell Ex. 5) regarding trade secrets or other secret or confidential information, he disputes that even the precise items listed therein should be considered confidential, including "information concerning business plans, financial information, products, ... strategic plans, advertising and marketing plans," *id.,* choosing instead to regard this closely held information as disclosable and usable if in his view some parts of these plans, strategies, or brand positions have been disclosed; this narrow view of the confidentiality time line has been shown to be incorrect and his continued misinterpretation runs the serious risk of breaching confidentiality in his new position whether he intended to do so or not. He has shown the poor judgment of helping Pillsbury to restructure its responsibilities among its principal marketing officers, to the extent of providing detailed ideas for improving Pillsbury's competitiveness in March, 1999 while he was still employed by Campbell, to the possible competitive detriment of Campbell. (Campbell Ex. 42.) [7]

Desatnick also has tended to minimize the significance of free vacation travel he has received for himself and his family from companies doing business with Campbell, in violation of Campbell's Worldwide Standards of Conduct (Campbell Ex. 32), which permits employees to accept gifts or favors "only if the gift is not money and is of only nominal value...." Entertainment may be accepted from time to time from a business contact, "but only if the entertainment is infrequent and not lavish." (Campbell Ex. 32 at 8–9.) These included at least four trips to Disney World for himself, his wife, and family, paid for by a television network, the most recent in 1998. Similarly, he attended golfing vacations in Florida and Vermont paid for by two magazines in which Campbell places ads. All his expenses to the 1996 Olympics were paid by a company with which he does business, and all expenses to a recent Super Bowl were paid by a television network on which Campbell places advertising. A full 1998 family weekend in Napa Valley, California was paid for by a television network. He reported none of these all-expense-paid vaca-

---

which are competitive with Campbell's Pepperidge Farms brands of cookies, cakes, breads, and pastries, the competitive overlap becomes much greater.

7. Mr. Desatnick's explanation concedes that he had performed similar work and restructuring for Campbell in many of these areas, but disclaims believing that he was helping

Pillsbury. He testified he was suggesting an architecture, not how to accomplish the tasks, in the context of trying to craft these functions for himself. This explanation was unsatisfactory and as a witness, he had difficulty agreeing that he had a duty not to do anything in his own behalf that might help the competition.

tions to others at Campbell, except for the first Disney World trip which he discussed with his former boss, Mr. Moss, who also took the trip and told him to take personal vacation time and keep a low profile so others would not get jealous. (*See* Desatnick Ex. II, photograph of Desatnick and Moss at Disney World.) Since the time when Moss left Campbell in about 1995, Desatnick never saw fit to report his elaborate entertainment gifts to the managing executive or director of compliance, as required by the Worldwide Standards of Conduct. His explanations for accepting these gifts and failing to report them, namely that "everyone was doing it," is supported only by the one instance with the departed Moss, above. The fallback justification that Campbell's business purposes were being served is belied by the facts that these were family trips on personal vacation time and by the thank you notes he wrote which never mentioned some item of business or follow-through from the hosted vacations. (*See, e.g.,* Campbell Exs. 27, 28, 29, 30, 31, 55, 56, 57.) The receipt of these unreported family vacation gifts shows bad judgment, while the explanations show a dissembling trait that undermines trustworthiness in observing duties of loyalty.

Finally, Campbell has demonstrated that Desatnick has used his position at Campbell to gain personal advantage with two of Campbell's advertising outlets, namely television stations in Philadelphia. (Campbell Exs. 25 & 26.) When the two local stations challenged his right to receive network feed service at his vacation home in the Poconos from a satellite provider, he threatened them on corporate letterhead that if the situation is not remedied, "I will be forced to reconsider the value of my company's buys on your station." (*Id.*) This episode, trivial in the overall scheme of things, nonetheless again shows a blurred judgment of the line between personal gain and corporate duty.

In short, the evidence of lack of candor further disinclines this court away from

seeking to equitably cobble together some sort of duties that Mr. Desatnick might perform at Pillsbury while scrupulously adhering to his duties under the non-compete clause.

Having summarized the relevant facts for purposes of this preliminary injunction motion, the court will next apply the law to those facts.

## DISCUSSION

### A. *Preliminary Injunction Standard*

■ When deciding a motion for a preliminary injunction under Rule 65(a), a district court must consider four factors:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997)(citing *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)(en banc)). The Third Circuit has held that the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm in the absence of injunctive relief in order to obtain a preliminary injunction, and that a preliminary injunction granted by a district court will not be sustained on appeal if either of these requirements is not satisfied. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197 (3d Cir.1990).

### B. *Analysis*

#### 1. *Likelihood of Success on the Merits*

■ Under New Jersey law, an agreement restricting an employee's ability to compete with his employer after the termination of his employment will generally be found to be reasonable and,

therefore, enforceable " 'where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.' " *Schuhalter v. Salerno,* 279 N.J.Super. 504, 508, 653 A.2d 596 (App. Div.), *cert. denied,* 142 N.J. 454, 663 A.2d 1361 (1995) (quoting *Solari Industries, Inc. v. Malady,* 55 N.J. 571, 576, 264 A.2d 53 (1970)). To minimize the hardship imposed on the employee, the geographic, temporal and subject-matter restrictions of an otherwise enforceable agreement not to compete will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests. *Coskey's Television & Radio Sales and Service, Inc. v. Foti,* 253 N.J.Super. 626, 634, 602 A.2d 789 (App.Div.1992)(citing *Solari,* 55 N.J. at 585, 264 A.2d 53.)

■ New Jersey courts "recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations." *Ingersoll–Rand Co. v. Ciavatta,* 110 N.J. 609, 628, 542 A.2d 879 (1988). New Jersey courts also recognize that "employers may have legitimate interests in protecting information that is not a trade secret or proprietary information," such as "highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which [an] employee has been 'exposed' and 'enriched' solely due to his employment." *Id.* at 638, 542 A.2d 879. New Jersey courts acknowledge the "business reality that modern day employers are in need of some protection against the use or disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enterprise." *Id.* at 638–39, 542 A.2d 879. Thus, "[t]hrough contract, an employer may protect its legitimate interest in preventing employees from using the thoughts and ideas generated by the employee and fellow workers while being paid by and using the resources of the employer to invent [or manufacture, sell, promote, etc.] a product that directly competes with the employer's product." *Id.* at 636, 542 A.2d 879.

On the other hand, New Jersey courts "will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Id.* at 635, 542 A.2d 879. New Jersey courts recognize that "knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person" and that "an employee can use those skills in any business or profession he may choose, including a competitive business with his former employer." *Id.* at 635, 542 A.2d 879. New Jersey courts acknowledge that restrictive covenants "clearly limit an employee's employment opportunities and in many instances probably interfere with an employee securing a position in which he could most effectively use his skills, at the same time depriving society of a more productive worker." *Id.* at 639, 542 A.2d 879.

Finally, New Jersey courts recognize the "competing public interests" in "safeguarding fair commercial practices and in protecting employers from theft of piracy of trade secrets, confidential information or … knowledge and technique in which the employer may be said to have a proprietary interest" and in "fostering creativity and invention and in encouraging technological improvement and design enhancement of all goods in the marketplace." *Id.*

■ "Accordingly, courts must evaluate the reasonableness of [a restrictive covenant] in light of the individual circumstances of the employer and employee" and "balance the employer's need for protection and the hardship on the employee that may result." *Id.* Because "[t]he line between [protectable] information, trade secrets, and the general skills and knowledge of a highly sophisticated employee

will be very difficult to draw," courts are expected to "narrowly" construe an employer's need for protection. *Id.* at 638, 542 A.2d 879. "In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive covenant." *Id.* at 635, 542 A.2d 879. "Conversely, in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable." *Id.*

This court finds that Campbell has proved that its corporate interests in enforcing the non-competition agreement as to Mr. Desatnick or any other senior executive in his position are deserving of judicial protection. The dominant purpose and effect of the restrictive covenant is to protect proprietary information and competitively sensitive plans and strategies and not to stifle competition. Campbell's interests are real and the enforcement of this contractual obligation is not unreasonable, nor does it result in undue hardship to the departing employee that is disproportional to the interests at stake. Further reasonableness is found in the "safety net" provision, which cushions the financial loss to the departing employee and which negates any intent to impose a punishment upon him.

In the present case, Desatnick argues that Campbell has no legitimate business interest in preventing him from joining Pillsbury because he does not possess any proprietary or confidential information that requires protection. As noted above, however, the record evidence in this matter reveals that during his tenure at Campbell Desatnick was exposed to a considerable amount of highly sensitive competitive information that is entitled to protection under New Jersey law.

According to his own resume, Desatnick was responsible for overseeing Campbell's $380 million global advertising, licensing and corporate promotion budget, and his functions included brand positioning, creative strategy, advertising and promotion campaigns, Campbell's Web site, corporate licensing, and media planning, buying and research. (Campbell Ex. 1.) As a member of Campbell's Leadership Team, Desatnick was privy to high-level confidential discussions of such matters as Campbell's strategic planning, financial performance, financial forecasting, and resource allocation. Much of the information discussed at Leadership Team meetings is more detailed than that which is disclosed in publicly available sources or released to financial analysts and shareholders.

During the last six months of his employment with Campbell, Desatnick attended a number of meetings at which highly sensitive and confidential business information was discussed. For example, Desatnick attended meetings related to Campbell's soup strategies between November 1988 and January 1999, including sensitive strategy sessions with Campbell CEO Dale Morrison concerning a new direction Campbell's plans to take in its soup advertising. Desatnick contributed to these meetings by offering his analysis of the effectiveness of Campbell's current soup advertising. As a result of his participation in these meetings, Desatnick is generally aware of Campbell's plans for brand positioning and pricing in the marketplace, its plans for resource allocation among product lines within the company, and its perceptions of its brands' strengths and vulnerabilities. Desatnick attended a confidential meeting involving high-level Campbell executives and representatives of Campbell's advertising agencies in January 1999 during which aspects of Campbell's three-year strategic plan were discussed. In February, 1999, Desatnick participated in a highly confidential meeting with a consultant regarding the quality of Campbell's advertising. Desatnick also reviewed proposed "story boards" for eleven different commercials reflecting the brand positioning of various Pepperidge

Farm products. These eleven commercials were eventually narrowed to three and will not be released until October 1999 through January 2000.

In sum, the record evidence reveals that Desatnick was exposed to a considerable amount of information of the type that is entitled to protection under New Jersey law. Contrary to Desatnick's suggestion, not all of this information will lose its confidential status as Campbell's rolls out its advertising campaigns for FY 2000. Campbell's has a legitimate business interest in preventing Desatnick from using this information to its disadvantage on behalf of Pillsbury, which is a key competitor of Campbell's in several core business areas, including soup and salsa and, to a lesser degree, bakery products.

Desatnick also contends that his non-competition agreement with Campbell is unenforceable because Campbell breached an oral contract of employment by requiring him to execute the non-competition agreement, and because Campbell did not provide him with any additional valuable consideration in exchange for his promise not to compete. Neither of these arguments has merit.

█ "Under general contract law, New Jersey has acknowledged for over three-quarters of a century that an act or promise of forebearance may be sufficient consideration to support an alleged oral contract of employment." *Smith v. Squibb Corp.*, 254 N.J.Super. 69, 73, 603 A.2d 75 (App.Div.), *cert. denied*, 130 N.J. 10, 611 A.2d 649 (1992). Thus, in *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 544 A.2d 377 (1988), the New Jersey Supreme Court recognized that an employer's assurances could create a binding contract between the employer and an employee under certain circumstances. Desatnick, however, has not met his burden of establishing the existence of such a contract.

█ Desatnick had a personal hope or expectation that he would receive a significant number of stock options each and every year of his employment with Campbell as a result of his conversations with Moss during February 1994, but Moss did not promise Desatnick that Campbell would grant him a guaranteed number of stock options each and every year of his employment with Campbell. Moreover, the terms of Campbell's offer of employment to Desatnick are embodied in the February 25, 1994 offer letter, not in the earlier conversations Desatnick had with Moss. The offer letter and the enclosed brochure explaining the stock option program made clear that stock option awards were discretionary. The offer letter did not provide for any fixed duration of employment or contain any limitation on Campbell's right to terminate Desatnick's employment at will. Desatnick had Campbell's offer letter in hand before he left his advertising agency position and rejected the offer of employment he had received from another advertising agency.

The facts of this case are remarkably similar to those in *International Paper Co. v. Suwyn*, 951 F.Supp. 445 (S.D.N.Y.1997). In that case, the court, applying New York law, rejected the defendant former employee's argument that a non-competition agreement he had signed two years into his employment with the plaintiff employer under threat of losing his eligibility for stock options was unenforceable because his offer letter had promised continued eligibility for stock options and the employer furnished no additional consideration in exchange for his promise not to compete. *Id.* at 447–48. The court noted that the employment was at-will because the offer letter "neither recited a fixed duration of employment, nor provided an express limitation on [the employer's] right to terminate [the employee's] employment." *Id.* at 448. Even assuming that the offer letter entitled the employee to continued eligibility for stock options, the court found that "once [the employer] changed the terms of [the employee's] employment by requiring [him] to execute the [non-competition agreement] and [the em-

ployee] elected to remain employed at [the employer] for a number of months, he effectively assented to the modification and commenced employment under new terms." *Id.* Because the employer had the right to discharge the employee without cause, its forbearance from that right was a legal detriment constituting adequate consideration for the restrictive covenant. *Id.*

Like the plaintiff in *International Paper*, Desatnick was an at-will employee with a mere expectation· that he would be eligible for stock options each and every year of his employment subject to the discretion of the Compensation Committee, as opposed to a contractual right to receive a guaranteed number of stock options each year of his employment. As under New York law, the continued employment of an at-will employee upon his execution of an agreement not to compete may constitute sufficient consideration to support the validity and enforceability of the restrictive covenant under New Jersey law. *Hogan v. Bergen Brunswig Corp.*, 153 N.J.Super. 37, 43, 378 A.2d 1164 (App. Div.1977). In this case, Campbell not only continued to employ Desatnick for nearly three years after he signed the 1996 non-competition agreement and for nearly two years after he executed the 1997 non-competition agreement, but also granted him valuable stock options that were conditioned on his execution of the agreements. In addition, the "safety net" provision of the 1997 non-competition agreement, which requires Campbell to pay Desatnick's base salary and medical benefits for most of the period during which the agreement prohibits Desatnick from accepting employment with a competitor so long as Desatnick is making a good faith effort to find alternative employment, also constitutes valuable consideration for Desatnick's promise not to compete.

Finally, Desatnick contends that the non-competition agreement is void because he signed it under economic duress. Under New Jersey law, however,

"[a] party alleging economic distress must show that he has been the victim of a wrongful or illegal act or threat" that "deprive[d] the victim of his unfettered will." *Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc.*, 93 N.J. 153, 175–76, 459 A.2d 1163, *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983) (citations omitted). In determining whether economic distress has been shown in a particular case, "the 'decisive factor' is the wrongfulness of the pressure exerted." *Id.* at 177, 459 A.2d 1163. However, " '[w]here there is adequacy of consideration, there is generally no duress.' " *Id.* (citations omitted). Here, Desatnick has not shown that there was anything "wrongful" about Campbell's demand that he execute a non-competition agreement as a condition to continued eligibility for stock options, and the court has determined that Campbell provided adequate consideration for Desatnick's promise not to compete. Moreover, Desatnick's claim of duress arises out of the circumstances under which he signed the 1996 non-competition agreement, when it is the 1997 non-competition agreement that Campbell would seek to enforce in this action. While Desatnick's claim of duress would lack merit even as to the 1996 non-compete agreement, such a claim is non-existent as to the 1997 agreement at issue.

In summary, the court holds that: (1) Campbell has a legitimate business interest in enforcing the 1997 non-competition agreement to prohibit Desatnick from using the highly confidential and proprietary business information he was privy to at Campbell to its competitive disadvantage at Pillsbury; (2) the 1997 non-competition agreement precludes Desatnick from accepting the CMO position at Pillsbury or any scaled-down version of that position; (3) Campbell did not breach any contract with Desatnick by insisting that he sign a non-competition agreement as a condition of his continued eligibility to receive stock options; (4) Campbell provided sufficient consideration for Desatnick's promise not

to compete in the form of continued employment, stock option grants, and financial relief from the consequences attendant to enforcement of the agreement; and (5) Desatnick was not under economic duress when he executed the non-competition agreement. Accordingly, Desatnick has not met his burden of demonstrating that he is likely to succeed at trial on the merits of his claim that his non-competition agreement with Campbell is invalid and unenforceable.

Since probability of success on the merits of Desatnick's claim is lacking, the court need not consider the additional elements that Desatnick would have had to establish to obtain preliminary injunctive relief.

## CONCLUSION

For these reasons, the court denies Desatnick's motion for a preliminary injunction enjoining Campbell from enforcing the non-competition agreement Desatnick executed in 1997 to prevent Desatnick from accepting an offer of employment from Pillsbury.