279 N.J. Super. 504 (1995)
653 A.2d 596
MURRAY SCHUHALTER AND M. SCHUHALTER & CO., P.C. (FORMERLY SCHUHALTER, SALERNO & CO., P.C.), A NEW JERSEY PROFESSIONAL CORPORATION, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
ANTHONY V. SALERNO, ANTHONY V. SALERNO & CO., P.A., A.V. SALERNO, A PROFESSIONAL ASSOCIATION, HOWARD R. BERLLY, DENNIS A. CANNON AND HERBERT WEBER, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 21, 1994.
Decided February 21, 1995.
*505 Before Judges GAULKIN, KESTIN and A.A. RODRIGUEZ.
*506 Steven C. Herzog argued the cause for appellants/cross-respondents (Sydney Hyman and Associates, attorneys; Brad S. Karp and Mr. Herzog, of the New York Bar, admitted pro hac vice, on the brief).
Patricia Breuninger argued the cause for respondents/cross-appellants (Breuninger & Hansen, attorneys; Ms. Breuninger and Laura LeWinn, on the brief).
The opinion of the court was delivered by GAULKIN, P.J.A.D.
In 1987, Murray Schuhalter and Anthony V. Salerno, principals in an accounting firm known as Schuhalter, Salerno & Co., P.C., (S & S) entered into an agreement for dissolution of the firm and apportionment of its assets and business. The agreement designated certain firm clients as Salerno's and the remainder as Schuhalter's, and restricted each of the principals from soliciting or serving the other's clients. Schuhalter brought this action in 1989, alleging, among other matters, that Salerno had breached the agreement by soliciting and serving Schuhalter's clients. Schuhalter also joined as defendants Howard R. Berlly, Dennis A. Cannon and Herbert Weber, former S & S employees who joined Salerno following the dissolution. The defendants asserted a number of counterclaims, including a claim that Schuhalter had wrongfully withheld monies due under the agreement. All the claims and counterclaims were dismissed before or at trial, except for two: the jury awarded Schuhalter $3000 in fees due under the agreement and found no cause for action on Salerno's claim for wrongful withholding of fees by Schuhalter. Schuhalter appeals, and Salerno cross-appeals, both asserting errors in the dismissal of the claims not submitted to the jury.

I
Schuhalter's central contention is that the Law Division wrongly held "that the parties' arms-length agreement was void as against public policy to the extent it conditioned, in any respect, the ability *507 of a former accounting partner to work for former clients of the partnership."
The dissolution agreement named particular S & S clients as Salerno's; the remaining clients were regarded as Schuhalter's. The parties agreed to "cooperate with the other to avoid placing a client of the other in a position of embarrassment or discomfort in continuing to engage [Schuhalter] or Salerno as that client's accountant." If a client of one "express[es] discomfort and/or dissatisfaction to the other," ... the recipient "shall promptly notify the other of the tenor and substance of the conversation(s)."
Section 4.7a of the agreement then provided that if the client
nevertheless expresses a desire to engage the other as that client's accountant, the other may, at ... his option, accept such engagement from the client after giving notice to the other party, and in the event of acceptance of such engagement, ... he shall pay to the other party (the former accountant) a sum equal to the billings of fees to such client by the other party (the former accountant) for the last full year, consisting of the 12 months immediately preceding, in sixty (60) consecutive equal monthly installments, without interest, the first installment being due and payable on the first day of the month following the date on which the party (the new accountant) accepting such client renders services to that client.
Finally, in Sections 12.1 and 12.2, Salerno and Schuhalter mutually covenanted that for two years after the dissolution neither would solicit or serve the other's clients except as allowed by Section 4.7a.
The First Count of Schuhalter's complaint alleged that Salerno violated the agreement by soliciting and serving Schuhalter's clients. Salerno denied those allegations and asserted that the restrictive provisions of the agreement were "unenforceable as violative of the public policy of the State of New Jersey." After some discovery, Salerno moved for partial summary judgment dismissing the First Count. A Law Division judge denied that application with the following explanation:
With respect to the question of the validity of the so-called restrictive covenant, however, it does not appear that summary judgment can be granted at this posture of the case. There is no question but that the clients of the accountants have the absolute right to choose the firm which shall be responsible for their accounting needs. The question, however, appears to be as to whether or not there was any active solicitation as to some of them or one of them as the case may be. *508 Consequently, partial summary judgment with respect to that aspect of the case shall be denied.
Some months later, Salerno again moved to dismiss the First Count. That motion was heard by a second judge, who interpreted the prior denial as a holding that "the restrictive covenants [are] unenforceable except as to solicitation." The second judge found that to be the law of the case, although he frankly acknowledged that "I'm not so sure that if the issue were before me afresh, without a prior ruling by [the first judge], that I would come to the same result." Based on that ruling[1], and on a finding that there was no proof of Salerno's actual solicitation of Schuhalter's clients, the judge dismissed the First Count.
The record supports the finding of no actual solicitation. But we conclude that the restrictive covenants are enforceable even in the absence of actual solicitation.

II
The modern New Jersey view of noncompetitive agreements was stated in Solari Industries, Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970):
Though noncompetitive agreements were at one time flatly outlawed, it is now well recognized that they do have a proper place and are enforceable under appropriate circumstances. Thus a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts. And while a covenant by an employee not to compete after the termination of his employment is not, because of the countervailing policy considerations, as freely enforceable, it will nonetheless be given effect if it is reasonable in view of all the circumstances of the particular case. It will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.
Here Salerno and Schuhalter can be regarded as both sellers and buyers of portions of the partnership business. Salerno does not contend otherwise, nor does he suggest that enforcement of the covenants should be restricted because of any unequal bargaining *509 power or other "countervailing policy considerations" associated with employer  employee covenants. See, e.g., Foti v. Cook, 220 Va. 800, 263 S.E.2d 430, 433 (1980) (restrictive covenant of partners of accounting firm are unlike employees' covenants). Salerno argues, rather, and the Law Division appears to have agreed, that he "fall[s] within that class of professionals whose services, like those of lawyers and doctors, are so personal and confidential in nature as to prohibit restrictive covenants which impinge on the public's right to free access to the professional of its choice."
Salerno relies on a series of New Jersey cases assertedly holding that "agreements between professionals whose services entail personal, confidential, and fiduciary relationships with their clients must not serve to restrict the public's rights of free choice of such professionals." We find no such principle in our case law.
The earliest of the modern New Jersey cases is Dwyer v. Jung, 133 N.J. Super. 343, 336 A.2d 498 (Ch.Div.), aff'd 137 N.J. Super. 135, 348 A.2d 208 (App.Div. 1975). There a law partnership was dissolved pursuant to an agreement parcelling out named clients to specific partners and providing that "all partners shall be restricted from doing business with a client designated as that of another partner for a period of 5 (five) years." Id. 133 N.J. Super. at 345, 336 A.2d 498. The court refused to enforce those restrictions, finding "[s]trong public policy considerations" against anything "which restricts the right of the client to repose confidence in any counsel of his choice." Id. at 346-47, 336 A.2d 498. Importantly, the court relied on the disciplinary rules promulgated by the American Bar Association and adopted in New Jersey declaring unethical any contractual restriction on the right of a lawyer to practice law. Id. at 347-49, 336 A.2d 498.
The narrow scope of the Dwyer holding is made clear in the subsequent cases. In Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161 (1978), the Supreme Court refused to invalidate a post-employment restrictive covenant ancillary to an employment contract between physicians. The Court held that, like post-employment covenants in commercial settings, a restraint on a physician *510 is enforceable "to the extent that it protects a legitimate interest of the employer, imposes no undue hardship on the employee, and is not injurious to the public." Id. at 412, 390 A.2d 1161. The Court specifically rejected the argument that Dwyer rendered restrictive covenants among professionals unreasonable per se. Id. at 418, 390 A.2d 1161. Rather, Dwyer "represents an exercise by the judicial branch of its unique constitutional responsibility for regulating the conduct of attorneys." Id. at 419, 390 A.2d 1161.
Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 607 A.2d 142 (1992), again confirmed that "any [contractual] provision, whether direct or indirect, that operates so as to restrict a lawyer's post-termination practice will contravene the ethical rule." Id. at 18, 607 A.2d 142. The Court held that "financial disincentive provisions, like direct prohibitions, are unenforceable" under the rule. Id. at 23, 607 A.2d 142. Nothing in the Court's opinion suggests the broad right of public access to professionals that Salerno urges here.
Salerno's principal reliance is on Mailman, Ross, etc. v. Edelson, 183 N.J. Super. 434, 444 A.2d 75 (Ch.Div. 1982). Edelson, a certified public accountant, had been employed by Mailman, an accounting firm, under an agreement that he would not "accept, solicit or offer" accounting services from or to Mailman clients for a period of two years after termination of his employment. Id. at 436, 444 A.2d 75. On Mailman's application for a preliminary injunction enforcing that covenant, the trial judge granted interim relief prohibiting only Edelson's "interference with [Mailman's] existing professional relationships." Id. at 444, 444 A.2d 75. The trial judge acknowledged that lawyers and doctors were treated differently in Dwyer and Karlin, but eschewed any attempt "to determine if accountants are more similar to doctors than to lawyers, or vice versa." Id. at 440, 444 A.2d 75. Rather, he evaluated Edelson's covenant under the three-part Solari test. The judge accepted, first, that "[a]n employer's ongoing professional relationship with its clients is generally recognized as a legitimate business interest which may be protected through a *511 restrictive covenant." Ibid. He acknowledged, second, that a covenant duration of two years is "generally held to be reasonable," id. at 441, 444 A.2d 75, and that no geographic limitation was necessary since the covenant sought to protect existing client relationships rather than a territorial sphere of influence. Id. at 441-42, 444 A.2d 75. But with respect to the third Solari criterion  whether the covenant was "injurious to the public"  the judge found that the "consensual and fiduciary" relationship between accountant and client made it unreasonable "to preclude [Mailman's] present clients from unilaterally exercising their free choice" to seek out Edelson. Id. at 444, 444 A.2d 75.
Mailman can be read as holding that accountants' covenants should be tested, like all other (except lawyers') covenants, by the Solari rules. To that extent, we agree with Mailman. See also La Porte v. Bott, 173 N.J. Super. 590, 414 A.2d 1363 (App.Div. 1980) (finding that proper proofs could warrant enforcement of a non-competition clause of an agreement dissolving an accounting partnership). However, Mailman also implies that covenants restricting professionals in their practice are necessarily so "injurious to the public" that they should rarely, if ever, be enforced. That implication is at odds with Karlin. In Karlin, where the employee doctor was contractually barred from practicing dermatology for five years within ten miles of his former employer's office, the Supreme Court not only found no per se invalidity, but did not even presume a public injury:
Significant here is the demand for the services rendered by the employee and the likelihood that those services could be provided by other physicians already practicing in the area. If enforcement of the covenant would result in a shortage of physicians within the area in question, then the court must determine whether this shortage would be alleviated by new physicians establishing practices in the area. It should examine also the degree to which enforcement of the covenant would foreclose resort to the services of the "departing" physician by those of his patients who might otherwise desire to seek him out at his new location. If the geographical dimensions of the covenant make it impossible, as a practical matter, for existing patients to continue treatment, then the trial court should consider the advisability of restricting the covenant's geographical scope in light of the number of patients who would be so restricted.
[77 N.J. at 424, 390 A.2d 1161].
*512 To be sure, the nature of the covenantor's occupation always bears on the evaluation of the public impact of the restraint. But the fact that Salerno is a professional accountant does not render his covenant unenforceable as a matter of law. See, generally, Stuart L. Pachman, Accountants and Restrictive Covenants: The Client Commodity, 13 Seton Hall L.Rev. 312, 313 (1983) ("Courts have repeatedly rejected the argument that the application of a restrictive covenant to an accountant is void as against public policy or that it is unreasonable per se"); Serena L. Kafker, Golden Handcuffs: Enforceability of Non-Competition Clauses in Professional Partnership Agreements of Accountants, Physicians, and Attorneys, 31 American Business L.J. 31, 37 (1993) ("Courts have decided the validity of non-competition clauses in accounting partnership agreements according to the traditional standard applied to any business or occupation  whether it is reasonable in the circumstances.")

III
Although New Jersey case law does not support Salerno's broad assertion of invalidity of restrictive covenants that "impinge on the public's right to free access to the professional of its choice," enforcement of his covenant is appropriate only "if it is reasonable in view of all the circumstances of the particular case." Solari, 55 N.J. at 576, 264 A.2d 53. We have no difficulty in finding the restrictions in the dissolution agreement to be reasonable.
Salerno does not dispute that the parties' mutual covenants protected their legitimate interests in maintaining their respective client relationships, the most significant assets of their partnership. The agreement made by each  to recompense the other for an asset ostensibly "bought" but in fact captured by the other within two years  is a reasonable means to assure the value of such assets for the "buyer." Karlin, indeed, suggests that such a covenant is a necessity: "only if the [former employee's] restrictive covenant is given effect can [the employer-physician] hope to *513 protect in some measure his legitimate interest in preserving his ongoing relationship with his patients." 77 N.J. at 417, 390 A.2d 1161. See also Jacob, 128 N.J. at 28-29, 607 A.2d 142 (recognizing "the importance of `goodwill' as an element of the value of a partner's interest" and the propriety of compensating for "the potential detrimental effect of the departure or a partner or partners on those remaining.")
Nor does Salerno urge that his covenant imposes an undue hardship on him. Its term was only two years, a modest imposition. Mailman, 183 N.J. Super. at 441, 444 A.2d 75. Unlike other covenants sustained in our courts, Salerno's commitment did not require him to forego or limit his professional activities, nor did it restrict his activities geographically. The covenant did create a financial disincentive to Salerno's servicing of Schuhalter's clients during the two-year period. But Salerno does not suggest  nor is there any reason to conclude  that an amount equal to one year's billings, paid over five years without interest, is an unreasonable price to acquire the business of an accounting client. Compare Jacob, 128 N.J. at 28, 607 A.2d 142 (finding a "penalty" where a single service for a single former client would forfeit "the entire compensation package"). Certainly the financial disincentive cannot be regarded as an undue hardship when weighed against Schuhalter's legitimate interest in retaining the business allocated to him under the dissolution agreement. As the court noted in Fuller v. Brough, 159 Colo. 147, 411 P.2d 18, 21 (1966), upholding a restrictive covenant in the dissolution of an accounting partnership, a partner's claim of undue hardship "loses its appeal when it is remembered that he sought to [impose] the same burden on [his former partner]."
Those same considerations also refute Salerno's claim that his covenant is an undue burden to the public. The public is not deprived of Salerno's services, nor is the public even required to seek Salerno out at a distant location. Salerno's covenant has an impact, at most, on a identified handful of clients that have historically aligned themselves with Schuhalter in any event. *514 Even those clients are not foreclosed from obtaining Salerno's services: they face only the possibility that Salerno will elect  for two years  not to service them rather than pay the client-acquisition cost fixed in the dissolution agreement. That short-term and narrow-scope inhibition, self-imposed by Salerno as part of the parties' mutual effort to preserve their professional goodwill, hardly qualifies as an excessive imposition on the public at large. Cf. A.T. Hudson & Co., Inc. v. Donovan, 216 N.J. Super. 426, 432-33, 524 A.2d 412 (App.Div. 1987) (holding that employer's interest in protecting customer relationships outweighs public interest in "an unrestricted choice of management consultants.") Pachman, supra, states the analysis well:
By restricting the accountant covenantee from rendering professional services to clients of his or her former firm, the court is within the ambit of the traditional rules of restrictive covenant law although there may be some adverse effect on the public; that is, those clients who would prefer to enjoy the continued services of the accountant leaving the firm. That effect, however, is avoided or lessened if instead of granting injunctive relief, the court requires the former employee or partner to pay for the clients "taken." By providing the purchase price and terms in the agreement, the court's task is made easier and the likelihood of enforcement is enhanced. Thus, the legitimate interest of the employer is protected without imposing undue hardship on the employee or being overly injurious to the public.
[13 Seton Hall L.Rev. at 322].
Our conclusions are supported by a significant body of case law in other jurisdictions. Illustrative is Holloway v. Faw, Casson & Co., 319 Md. 324, 572 A.2d 510 (1990), where an accounting firm sued a withdrawing partner to enforce his promise not to service firm clients for five years and to pay the firm
100% of the prior year's fee for any clients that were [the firm's] who engage the services of the withdrawing partner during the five-year period [of his covenant not to service such clients].
The Maryland Court of Appeals analyzed the provisions as restrictive covenants, id. 572 A.2d at 515, and applied the same three-part test described in Solari. Id. 572 A.2d at 516. The court sustained the covenants, noting that they did not prohibit competition but simply obliged the withdrawing partner, in effect, to purchase from the former firm the account of any firm client he serviced. The agreement thus

*515 ties the restriction closely to [the firm's] interest in its client base, inhibits [the withdrawing partner's] practice of accountancy only with respect to that client base, and gives the general public, outside of that client base, the benefit of unfettered competition. The reasonableness of the provision is further reinforced by its ready analogy to the purchase of an accounting practice, or of part of an accounting practice.
Id. at 520. The court also found that the "fee equivalent provision is a valid liquidated damage clause," id. at 526, noting the expert testimony "that accounting practices ... are purchased at prices determined by multiplying annual billings by a factor in a range which comfortably includes the factor ... utilized in the Agreement." Id. at 520.
Another exemplar, Perry v. Moran, 109 Wash.2d 691, 748 P.2d 224 (Wash. 1987), judgment modified on reconsideration, 111 Wash.2d 885, 766 P.2d 1096 (1989), involved an accountant's agreement not to provide services to his former employer's clients for a period of five years; if the employee violated that undertaking, the employer had the option to require the employee to pay "fifty percent (50%) of the actual fees billed or billable to such Client Accounts by Employee each year for a period of three (3) years commencing with the date Employee first renders services to such Client Accounts." Upholding the covenants, the Washington Supreme Court rejected the suggestion that a prohibition on soliciting or diverting clients would be sufficient protection for the employer:
A covenant that merely prohibits solicitation or diversion places upon the employer the burden of proving (1) that the former employee performed some act or acts which had the potential of enticing clients away from the employer, and (2) that those acts were the cause of the client's decision to leave the employer and seek accounting services from the former employee. If this burden were placed upon an employer, the process would be difficult and expensive. The employer would be required to invest time and money in litigating the nature of the former employee's actions toward the clients. In many cases the employer would have to bring those clients into the litigation as witnesses to prove that solicitation occurred. Particularly where, as here, those clients are doctors, clinics and business corporations, an attempt to involve the clients in litigation would damage the goodwill existing between those clients and the employer, and would damage the reputation of the employer with potential clients. A prudent employer could not rely on such a covenant to protect its client base. It is reasonable for the employer to preclude *516 the employee from servicing those who were clients of the employer during the period of employment and for a period after the cessation of employment.
In evaluating the reasonableness of the payment obligation, the Perry court relied on an earlier Washington case, Knight, Vale & Gregory v. McDaniel, 37 Wash. App. 366, 371, 680 P.2d 448, 452, review denied, 101 Wash.2d 1025 (1984), where an accountant covenanted not to service his employer's former clients for three years. The contract provided that, if the employee breached, he would pay the employer 35% of fees billed or billable to those clients within the three-year period. The court found that provision to be appropriate:
Harm resulting to one business from the competition of another business is difficult to estimate accurately. Here, however, there was an expert's uncontroverted affidavit that the damages sought of 35 percent of any fees collected reflect no more than a reasonable forecast of the harm to the employer occasioned by a breach of the covenant. Because the formula is based upon a percentage of competing business actually occurring it is directly linked to the actual damage to goodwill experienced by the employer. In addition, the 35 percent figure is based upon a general formula in the accounting field for purchase of an ongoing practice. In short, the clause is not an arbitrary estimate of damages, is not a penalty and is enforceable.
See also, e.g., Criss v. Davis, Presser & LaFaye, 494 So.2d 525 (Fla.App.), rev. denied, 501 So.2d 1281 (Fla. 1986) (upholding accountant's noncompete covenant requiring payment upon breach of 150% of prior year's billings to client); Rhoads v. Clifton, Gunderson & Co., 89 Ill. App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980) (simile, but payment of two years' fees from clients upon breach); Engel v. Ernst, 102 Nev. 390, 724 P.2d 215 (1986) (simile, but payment of average annual billings to client over three years); Foti v. Cook, 220 Va. 800, 263 S.E.2d 430 (1980) (simile, but payment of one-third of fees collected from client for three years.)[2]
*517 Although there are some contrary holdings supportive of Salerno's position, they are few and unpersuasive. See, e.g., Smith, Batchelder & Rugg v. Foster, 119 N.H. 679, 406 A.2d 1310, 1314 (1979) (accountant's three-year noncompete covenant, with agreement to pay fifty percent of fees received in breach, held "unreasonable with respect to the interests of the employer, the employee, and the public.") We hold that Salerno's covenants are enforceable as written.

IV
The contentions advanced on the cross-appeal are without merit. R. 2:11-3(e)(1)(E). The fact that Schuhalter unsuccessfully pressed a claim for the so-called "Weber accounts" does not, on the record before us, justify a finding of fraud or breach of any asserted covenant of good faith and fair dealing.
The dismissal of the First Count of the complaint is reversed. The judgment is affirmed in all other respects. The matter is remanded to the Law Division for further proceedings, consistent with this opinion, to dispose of the First Count claims.
NOTES
[1] The judge need not and should not have treated the prior denial of partial summary judgment as establishing the law of the case. A & P Sheet Metal Co., Inc. v. Hansen, Inc., 140 N.J. Super. 566, 357 A.2d 37 (Law Div. 1976).
[2] On reconsideration in Perry, 111 Wash.2d 885, 766 P.2d 1096, the Washington Supreme Court found it premature to determine the reasonableness of the liquidated damages clause, because that question, raised by the employee, had not been decided in the trial court. Salerno has not argued, nor do we find any reason to conclude, that the covenants here impose financial obligations disproportionate to the presumable losses caused by the prohibited competition. See, generally, Central Steel Drum Co. v. Gold Cooperage, Inc., 200 N.J. Super. 251, 491 A.2d 49 (App.Div.), certif. denied, 101 N.J. 303, 501 A.2d 960 (1985).