820 A.2d 105 (2003)
359 N.J. Super. 420
Karol MAW, Plaintiff-Appellant,
v.
ADVANCED CLINICAL COMMUNICATIONS, INC., and Michael Forte, President, Advanced Clinical Communications, Inc., Defendant Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 2003.
Decided April 16, 2003.
*109 Richard M. Schall, Moorestown, argued the cause for appellant (Schall & Barasch, attorneys; Mr. Schall and Patricia A. Barasch, on the brief).
Debbie Rodman Sandler, Philadelphia, PA, argued the cause for respondents (White and Williams, attorneys; Ms. Sandler, on the brief).
Before Judges CUFF, LEFELT and WINKELSTEIN. *106 *107
*108 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiff Karol Maw was employed by defendant Advanced Clinical Communications, Inc. (ACCI) as a graphic designer from November 1, 1997, until she was fired in March 2001 for refusing to sign an employment agreement (Agreement) containing a covenant not to compete. The Agreement precluded, among other things, plaintiff from becoming employed by any competitor or customer of ACCI for a period of two years following the termination of her employment.
Maw brought her claim under both the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and the common law for wrongful discharge in violation of public policy. She appeals the Law Division's February 14, 2002, order dismissing her complaint pursuant to Rule 4:6-2(e). Because the judge found that a noncompete agreement does not per se violate public policy, she dismissed plaintiff's CEPA and common-law claims against both the corporate and individual defendants.
Plaintiff argues that the restrictive covenant violates public policy because her employer had no legitimate business reason to require her to sign it; consequently, she asserts that her refusal to sign it is protected by both CEPA and common law. We agree that a noncompete agreement, such as the one plaintiff was required to sign, may, depending on the surrounding circumstances, violate the public policy necessary to support a cause of action under CEPA and at common law. Therefore, dismissal of plaintiff's claims before she had an opportunity to develop her case through discovery was premature. Accordingly, we reverse.

I
Because this case comes before the court on defendants' motion to dismiss, the test is whether the alleged facts "suggest" a cause of action. Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 625-26, 660 A.2d 505 (1995). Plaintiff is entitled to all reasonable inferences in her favor and we must "`search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim.'" Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989) (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J.Super. 244, 252, 128 A.2d 281 (App.Div.1957)). Given this standard, we take the facts directly from plaintiff's complaint.
ACCI provides marketing and educational services for the pharmaceutical and healthcare industries. It employs medical educators and clinical researchers to conduct educational programs for healthcare professionals. ACCI hired plaintiff on November 1, 1997, as a graphic designer, to design written materials *110 used by ACCI in its marketing and educational programs. She provided creative design concepts for written and graphic materials; prepared the design and layout of technical charts, graphs, and reports; and worked with vendors on design issues.
Plaintiff's job required knowledge and experience in graphic design and its related technologies. Knowledge of, or experience in, the pharmaceutical or healthcare industries was also viewed as beneficial, providing familiarity with the scientific and medical terminology used in the literature being produced. However, such knowledge and experience were not job requirements for ACCI's graphic designers. In plaintiff's final performance appraisal, only one of the seventeen rated "major business objectives" and "performance factors" involved knowledge of the pharmaceutical industry, and that aspect of the appraisal focused on plaintiff's knowledge of scientific and medical terminology. Plaintiff had no training or education in any medical or pharmaceutical science, and understood little about the substantive content of the materials she produced.
In January 2001, ACCI decided to require all employees, at the level of "Coordinator" and above, to sign an employee agreement. Defendants made no distinction between the employees in this category based on their job duties. Nor did defendants identify the nature of the legitimate business interests they were seeking to protect through execution of the Agreement.
The Agreement states that:
B. Company wishes to expand Employee's responsibilities, expand Employee's opportunities for client contact and enhance Employee's compensation opportunities but only upon the terms and conditions, including, but not limited to, the restrictions as to use of confidential and proprietary information by Employee and Employee's undertaking not to compete with Company, all as set forth in this Agreement.
Section 7, captioned CONFIDENTIAL AND PROPRIETARY INFORMATION, prohibited the employee from disclosing any confidential information, either during or after employment. It says:
7.1 The Employee understands that in the performance of her duties hereunder she shall observe and may obtain knowledge of, ... certain information relating to the business of the Company, that is confidential and proprietary (the `Confidential Information'). As used herein, `Confidential Information' includes, but is not limited to any information, trade `know-how', trade secrets, pricing policies, operational methods, methods of doing business, technical processes, formulae, designs and design projects, inventions, research projects, or other information that relates to the business affairs of the Company,....
The Agreement contains a restrictive covenant, which states, in pertinent part:
SECTION 8. NONCOMPETE COVENANT

8.1 During the Term and for a period of two (2) years after: ... termination of the Term ... without first obtaining the prior written consent of the Company which consent shall not be unreasonably withheld or delayed, the Employee shall not directly or indirectly:
(i) enter the employment of or render any services to, or make any financial contribution whatsoever to any person,... or any other entity (a `Competitor') that solicits or otherwise engages in business with any `Customer', as defined in Section 8.2, below; or
(ii) solicit or encourage any employee to leave the employment of the Company... or hire any employee who has left *111 the employment of the Employer within one (1) year of the termination or expiration of such employee's employment; or
(iii) become employed by a Customer of Company which employment relates directly or indirectly to any products, services or projects regarding which the Company has performed any service at any time during the period of two (2) years prior to the expiration or termination of Employee's employment under this Agreement.
8.2 For purposes of this Section 8, a Customer shall mean any client or customer of Company for which Company or such affiliates has (i) performed services, (ii) performed research and proposal development under an agreement of confidentiality, or (iii) generated income for Company, within two (2) years of the date of the termination or expiration of the Employee's employment under this Agreement.
The Agreement also informed the employee to "obtain independent counsel" to review the Agreement, and plaintiff did so, consulting with an attorney. Based on those discussions, plaintiff proposed certain changes to the Agreement. Plaintiff did not object to Section 7, but she did object to the noncompete covenant. She suggested certain changes, including, among others, limiting the duration of the noncompete period. She was told, however, by a company representative, that "it is the President's [c]ompany and that he is not going to make any exceptions." In other words, defendants would not consider any of plaintiff's proposed changes.
When plaintiff refused to sign, by letter of March 15, 2001, ACCI terminated her employment. The letter said, in part, "it is necessary that all employees, (Coordinator level and beyond) sign an Employee Agreement. We have not received your signed contract as of the March 15, 2001 deadline. Therefore, you are terminated based on noncompliance with company policy."
Plaintiff alleges the noncompete clause violated public policy because it had no legitimate business justificationit would not have protected any of defendants' legitimate business interests. Instead, she claims it was intended solely to stifle competition, and would have been unduly burdensome on her, by substantially limiting her employment opportunities if she left ACCI, hindering her ability to earn a living and support her family.
While plaintiff admits she "may have had access to certain confidential material in the course of performing her designing duties," she claims her access to such material was no different from that of ACCI's administrative and clerical staff, who were not asked to sign the Agreement. Moreover, plaintiff asserts that much of the information contained in the literature she produced was already publicly available.

II
The motion judge dismissed plaintiff's CEPA claim, finding that "plaintiff, who is an at-will employee, enjoys no right to dictate the terms and conditions of her employment to the extent that she claims that the particular restrictive covenant is a violation of public policy." The judge was "not persuaded" that the noncompete clause violated public policy. The court agreed with defendants' argument that "[t]he reasonableness of the non-compete provisions of the defendants' proposed restrictive covenant can only be determined once plaintiff has signed the agreement, left, and attempted to work for some other entity. Under that scenario there is a factual framework against which the reasonableness *112 of the restrict[ive] covenant may be tested."
On appeal, plaintiff maintains that as a graphic artist, she was a low-level employee, with no knowledge or understanding of the content of the writings with which she was working, and she had no contact with defendants' clients or customers. Therefore, a noncompetition agreement would serve only the unlawful purpose of binding her to her employment with ACCI, and restricting her post-ACCI employment opportunities. Plaintiff further argues that, as written, the Agreement's noncompetition clause is overbroad, unreasonable, and unduly oppressive. Based upon these arguments, plaintiff contends that the Agreement, as applied to her, violates New Jersey public policy, and termination of her employment for refusing to sign it creates valid CEPA and common-law claims.

III
At common law, "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980). "An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy." Ibid. CEPA provides the employee with similar protection. N.J.S.A. 34:19-3c(3) prohibits employers from taking any retaliatory action against an employee, because the employee:
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
* * *
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
To establish a Pierce claim, or a claim under N.J.S.A. 34:19-3c(3), a plaintiff must first articulate the existence of a clear mandate of public policy which, if the allegations are true, the employer's conduct would violate. Kolb v. Burns, 320 N.J.Super. 467, 476, 727 A.2d 525 (App.Div.1999). Whether a plaintiff has adequately established the existence of a clear mandate of public policy is a threshold issue of law, to be decided by the court. Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187, 707 A.2d 1000 (1998); McLelland v. Moore, 343 N.J.Super. 589, 600-01, 779 A.2d 463 (App.Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002); Kolb, supra, 320 N.J.Super. at 476, 727 A.2d 525; Fineman v. N.J. Dept. of Human Servs., 272 N.J.Super. 606, 620, 640 A.2d 1161 (App.Div.), certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994). As sources of public policy, the court looks to federal and state constitutions, statutes, administrative rules and decisions, judicial decisions, and professional codes of ethics. Mehlman, supra, 153 N.J. at 188, 707 A.2d 1000; Pierce, supra, 84 N.J. at 72, 417 A.2d 505. Although these sources are not exclusive, "[a] salutary limiting principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." Mehlman, supra, 153 N.J. at 188, 707 A.2d 1000.
"[T]he Legislature has explicitly provided under section 3c(3) that an employee shall not be subject to retaliatory action when he or she objects to any activity that the employee `reasonably believes... is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.' "Estate of Roach v. TRW, Inc., 164 N.J. 598, 609, 754 A.2d 544 (2000). *113 Section 3c(3) was enacted "to encourage conscientious employees to disclose or object to activities encapsulated in that section." Id. at 611, 754 A.2d 544. CEPA's overriding policy is to protect society at large. Cedeno v. Montclair State Univ., 163 N.J. 473, 478, 750 A.2d 73 (2000).
To meet the threshold showing that the activity in which the employee refuses to participate is incompatible with a clear mandate of public policy, it is sufficient that the court be able to identify "the law or public policy that might have been violated by the challenged conduct"; McLelland, supra, 343 N.J.Super. at 600, 779 A.2d 463; it is not necessary that the conduct be an actual violation of a law or regulation. Estate of Roach, supra, 164 N.J. at 613, 754 A.2d 544. As the Court noted in Mehlman, "[t]he object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to ... conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare." 153 N.J. at 193-94, 707 A.2d 1000.
Here, plaintiff claims that by forcing her to sign what she claims to be an unenforceable noncompete covenant, her employer violated a clear mandate of public policy. Because no court in this State has addressed this issue, we first need to examine how noncompete agreements are viewed under New Jersey law.
Noncompetition agreements are looked upon unfavorably by the courts, as potential restraints on trade. Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F.Supp.2d 727, 757 (D.N.J.1998); and see Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 33-34, 274 A.2d 577 (1971) (citing to New Jersey's Antitrust Act, N.J.S.A. 56:9-1 to -19, for proposition that employers have no legitimate interest in using such agreements solely to prevent competition). To be enforceable, a restrictive covenant must be reasonable under the circumstances. Graziano v. Grant, 326 N.J.Super. 328, 343, 741 A.2d 156 (App.Div.1999). A restrictive covenant is reasonable if it protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public. Whitmyer Bros., supra, 58 N.J. at 32-33, 274 A.2d 577; Solari Indus., Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970); Schuhalter v. Salerno, 279 N.J.Super. 504, 508, 653 A.2d 596 (App.Div.), certif. denied, 142 N.J. 454, 663 A.2d 1361 (1995); Coskey's Television & Radio Sales and Serv., Inc. v. Foti, 253 N.J.Super. 626, 633-34, 602 A.2d 789 (App.Div.1992); Raven v. A. Klein & Co., Inc., 195 N.J.Super. 209, 213, 478 A.2d 1208 (App.Div.1984).
"The first two parts of the Solari/Whitmyer test focus on the protection of the legitimate interests of the employer and the extent of the hardship on the employee." Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 634-35, 542 A.2d 879 (1988). "[T]he court must balance these competing interests." Id. at 635, 542 A.2d 879. When an employer's interests are strong, as seen in cases involving trade secrets or confidential information, a court will enforce a restrictive covenant; however, when the employer's interests "do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable." Ibid. A court will not enforce restrictive covenants "principally directed at lessening competition." Raven, supra, 195 N.J.Super. at 213, 478 A.2d 1208.
The third part of the Solari/Whitmyer test relates to the public interest. Ingersoll-Rand, supra, 110 N.J. at 639, 542 A.2d 879. "[T]he public has a clear interest *114 in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." Ibid.
Defendants urge, and the motion judge agreed, that no violation of public policy could be found because noncompete agreements are not per se invalid. As a general rule, they are correct. But, as is clearly established in the case law, a court must carefully scrutinize the interests asserted by the employer before the noncompete clause is determined to be reasonable and enforceable. The agreements may not be used merely to restrict competition, nor to bind particular employees to the employer. Id. at 639-40, 542 A.2d 879. "`A restraint on the employee is illegal when its purpose is the prevention of competition, except when the methods of competition ... are ... commonly regarded as improper or unfair.'" Whitmyer, supra, 58 N.J. at 35-36, 274 A.2d 577 (quoting 6A Corbin on Contracts § 1394 (1962)).
Thus, to subject an employee to a noncompete covenant in the first instance, the employer must demonstrate that it has legitimate interests which require protection through such an agreement. Id. at 36-37, 274 A.2d 577. This requires an analysis of the employee's job, to determine whether the employee has access to information worthy of protection through a noncompetition agreement, such as highly confidential or proprietary business information, trade secrets, or customer relations information. Ingersoll-Rand, supra, 110 N.J. at 628, 542 A.2d 879. On the other hand, matters of general knowledge within an industry, the skills or experience an employee learned or developed during an employee's tenure with the employer, or the knowledge, skills, or abilities an employee brought with him to the employer, are not worthy of protection through a noncompetition agreement. Id. at 629-30, 642-43, 542 A.2d 879; Coskey's, supra, 253 N.J.Super. at 637-39, 602 A.2d 789; Raven, supra, 195 N.J.Super. at 213-14, 478 A.2d 1208.
If the employee does not have access to trade secrets or other confidential or proprietary information, then a noncompetition agreement may not be enforced against the employee, regardless of its terms. Such an agreement will be viewed as serving no legitimate purpose, and as an unlawful and unenforceable restraint on trade. Ingersoll-Rand, supra, 110 N.J. at 635, 542 A.2d 879; Whitmyer, supra, 58 N.J. at 36-37, 274 A.2d 577. If, on the other hand, the employee does have access to trade secrets, or other confidential or proprietary information, warranting imposition of a noncompetition agreement, then consideration moves to the second and third elements of the three-pronged Solarii>/Whitmyer test.
Here, focusing on the first prongprotection of the employer's legitimate business interestsplaintiff contends that given her position within the company, she was not privy to any trade secrets, proprietary or otherwise confidential information, and had little or no interaction with the company's customers. Much of the information with which she worked was already public. While she admits she may have had access to some "confidential material," she claims her access was limited, and no greater than that of ACCI's administrative and clerical staff, who were not required to sign noncompetition agreements. Moreover, plaintiff alleges that she had little understanding of the substantive content of the documents she was creating. This latter allegation may become significant because our law recognizes *115 that human beings have a limited capacity for the retention of information they do understand, let alone information they do not, and employers cannot demand that its employees sign a noncompete agreement based on the presumption that employees will retain knowledge of every document they have ever viewed. See Laidlaw, supra, 20 F.Supp.2d at 759 (recognizing that employee would have to be "the Rainman" to be able to retain, recall, and make use of information contained in documents with which he worked while employed by defendant, where he did not take those documents with him when he left).
The judge dismissed the complaint on a Rule 4:6-2(e) motion, based solely on the pleadings. At this stage of the litigation, plaintiff is entitled to all legitimate inferences which arise from her factual allegations. These facts and inferences show that plaintiff has neither access to trade secrets nor other confidential, proprietary information; or, to the extent that she has, she does not understand it; and her access is no different from those employees not required to sign the Agreement. Under these circumstances, we may infer that defendants do not have a proprietary interest vis-a-vis plaintiff which is worthy of judicial protectionthat the noncompete covenant, as it applies to plaintiff, does not protect defendants' legitimate business interests. As a result, the noncompete covenant's effect may be principally directed at lessening competition, which the courts of this State have recognized as injurious to the public. See Whitmyer, supra, 58 N.J. at 32-33, 274 A.2d 577; Solari, supra, 55 N.J. at 585, 264 A.2d 53; Raven, supra, 195 N.J.Super. at 213-14, 478 A.2d 1208. Therefore, if plaintiff's allegations are proven, firing her for refusing to sign the Agreement may violate public policy and support a CEPA or Pierce cause of action.
A review of the complaint also supports plaintiff's contention that the noncompete clause may be unduly burdensome to her. A restrictive covenant can cause undue hardship to an employee if it places substantial limitations on where an employee may work or if it prevents an employee from engaging in his or her livelihood. Platinum Mgmt., Inc. v. Dahms, 285 N.J.Super. 274, 298-99, 666 A.2d 1028 (Law Div.1995). To determine whether the hardship is undue, consideration is given to the nature of the profession, the duration of the restriction, the geographic area of the restriction and the type of restriction. Schuhalter, supra, 279 N.J.Super. at 509-11, 653 A.2d 596. Factors include, but are not limited to, (1) the agreement's geographic and temporal scope; (2) whether the types of activities restrained are those which would place the employee in actual competition with the former employer; and (3) whether the covenant will unduly burden the employee in finding work in his or her field. Karlin v. Weinberg, 77 N.J. 408, 423-24, 390 A.2d 1161 (1978); Coskey's, supra, 253 N.J.Super. at 634-39, 602 A.2d 789; Platinum Mgmt., Inc., supra, 285 N.J.Super. at 293-300, 666 A.2d 1028.
In this case, the noncompete clause includes provisions that may be unduly burdensome in time and geography. The agreement extends for two years after plaintiff leaves ACCI, but gives no explanation as to why such a lengthy period of time is necessary. It also contains no geographic limitation. Theoretically, this would prevent plaintiff from engaging in a similar type of employment anywhere in the world. Given these restrictions, the hardship on plaintiff may, on balance, outweigh the employer's competing business interests. See Solari, supra, 55 N.J. at 576, 264 A.2d 53. At this early stage of *116 the litigation, that is enough to support plaintiff's claim to a viable cause of action.
We recognize that no New Jersey case has previously addressed whether a CEPA or Pierce claim may arise in the context of an employee's refusal to sign a noncompete clause. But, for the reasons expressed, we find that New Jersey's strong prohibition against restraint of trade, and against unduly burdening employees by restricting their right to engage in their chosen field of employment, establishes the public policy necessary to support a CEPA and Pierce common-law cause of action. See D'Sa v. Playhut, Inc., 85 Cal.App.4th 927, 102 Cal.Rptr.2d 495, 497 (2000), review denied (Mar. 21, 2001) (holding "employer cannot lawfully make the signing of an employment agreement, which contains an unenforceable covenant not to compete, a condition of continued employment,.... [A]n employer's termination of an employee who refuses to sign such an agreement constitutes a wrongful termination in violation of public policy").[1]

IV
In rendering its decision, the Law Division concluded that the reasonableness of a noncompete provision may only be determined once an employee has signed the agreement, left employment, "and attempted to work for some other entity." The judge was apparently referring to the line of cases where, after the employee leaves his or her employment, the validity of noncompete clauses generally arises in the context of the former employer attempting to enforce a noncompete agreement, or the former employee seeking to avoid the agreement, by pursuing injunctive relief. Karlin, supra, 77 N.J. 408, 390 A.2d 1161; Solari, supra, 55 N.J. 571, 264 A.2d 53; Coskey's, supra, 253 N.J.Super. 626, 602 A.2d 789; A.T. Hudson & Co., Inc. v. Donovan, 216 N.J.Super. 426, 524 A.2d 412 (App.Div.1987); Hogan v. Bergen Brunswig Corp., 153 N.J.Super. 37, 378 A.2d 1164 (App.Div.1977); Platinum Mgmt., supra, 285 N.J.Super. 274, 666 A.2d 1028.
However, we find no reason to require an employee with a reasonable belief that a noncompete clause violates public policy to have to wait until she leaves her employment to have her rights adjudicated. Upon signing the Agreement, plaintiff would be burdened with the Agreement's restrictions should she decide to seek another job. She would have to limit her job search. For two years, she could not accept a job from any of defendant's competitors or customers. And where could she look for a job in her field? The Agreement has no geographic limitations. If she wants to continue to work in her chosen field, she will be "married" to her employer. Alternatively, she could ignore the restrictive covenant, and wait for defendant to sue her. Neither choice fosters New Jersey's public policy of prohibiting restraints of trade and encouraging competition. We see no purpose to require an employee to sign what may be a legally unenforceable noncompete clause, under the threat of discharge, and then wait to litigate the agreement should the employer seek to enforce it at a later date.

V
We next address whether CEPA allows for individual liability. The motion judge *117 dismissed the claim against defendant Forte, ACCI's president, based on the same reasoning as she did the claim against the corporationthat plaintiff had not established a violation of public policy. She noted in passing, however, that CEPA does provide for individual liability.
Although no New Jersey case directly addresses this issue,[2] federal decisions have concluded that individual liability may be imposed under CEPA. See Espinosa v. Cont'l Airlines, 80 F.Supp.2d 297, 305-06 (D.N.J.2000) (individual defendants may be held individually liable under CEPA); Palladino v. VNA of S.N.J., Inc., 68 F.Supp.2d 455, 474 (D.N.J.1999) ("the imposition of individual liability for offending conduct furthers CEPA's protective and remedial purposes"). We agree.
Under CEPA, an "employer" is liable for retaliation against an employee. N.J.S.A. 34:19-3. An "employer" is defined as "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J.S.A. 34:19-2a (emphasis added). The underlined portion of the definition of "employer" includes a business entity's employee. A fair reading of the statute therefore makes both the employer and the employee subject to CEPA's prohibitions. See State v. Churchdale Leasing, Inc., 115 N.J. 83, 101, 557 A.2d 277 (1989) ("When a statute is clear on its face, a court need not look beyond the statutory terms to determine the legislative intent."). This interpretation is also consistent with CEPA's broad remedial purpose to afford prevailing plaintiffs all of the same remedies that are available "in common law tort actions." N.J.S.A. 34:19-5. We therefore also reverse the judgment insofar as it dismissed plaintiff's claim against Forte.

VI
Finally, we turn to whether the court's dismissal of plaintiff's common-law claim for wrongful discharge was warranted. CEPA contains an exclusivity clause which provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8. Thus, "[p]arallel claims based on those rights, privileges and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge." Young v. Schering Corp., 141 N.J. 16, 29, 660 A.2d 1153 (1995). The waiver provision does not apply to claims that are substantially independent of the CEPA claim. Id. at 33, 660 A.2d 1153.
Here, the issue is not whether plaintiff ultimately may bring both a common-law claim and a CEPA claimplaintiff acknowledges that she must elect one or the otherbut rather at what point must plaintiff make the election.
Common-law claims of wrongful discharge in violation of public policy, which merely duplicate a CEPA claim, are routinely dismissed under CEPA's exclusivity provision, albeit, generally at later stages of the litigation. Falco v. Cmty. Med. Ctr., 296 N.J.Super. 298, 304, 318, 686 A.2d 1212 (App.Div.1997), certif. denied, 153 N.J. 405, 709 A.2d 798 (1998); Catalane v. Gilian Instrument Corp., 271 *118 N.J.Super. 476, 492-93, 638 A.2d 1341 (App.Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994); Flaherty v. The Enclave, 255 N.J.Super. 407, 413, 605 A.2d 301 (Law Div.1992). Indeed, the Supreme Court has held that this was precisely the Legislature's intent in enacting CEPA's exclusivity provision. Young, supra, 141 N.J. at 27, 660 A.2d 1153 ("we are persuaded that the Legislature intended that the N.J.S.A. 34:19-8 waiver prevent an employee from pursuing both statutory and common-law retaliatory discharge causes of action" and "curtail ... cumulative remedial actions").
Although none of the cases cited specifically address at what point the election must be made, Young is instructive. The Court found the election needed to be made "once a CEPA claim is `instituted.'" Id. at 29, 660 A.2d 1153. However, in discussing the meaning of "institution of an action," the Court noted that "[t]he meaning of `institution of an action' could conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete or the time of a pretrial conference contemplated by Rule 4:25-1. Another question is whether the statutory waiver is applicable if the CEPA claim is withdrawn or otherwise concluded prior to judgment on the merits." Id. at 32, 660 A.2d 1153. We take this language to mean that before electing remedies, a plaintiff should have an opportunity to complete discovery. Only after gaining access to all of the facts, will a plaintiff be in a position to make a knowing and meaningful election. Here, plaintiff was not given that opportunity. As such, we also reinstate plaintiff's common-law claim.
Reversed.
CUFF, J.A.D., dissenting.
The issue in this appeal directly implicates the scope of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. Specifically, the issue is whether CEPA protects an employee who refuses to sign a confidentiality and noncompete agreement and is terminated by her employer. I would rule that the discharge does not violate CEPA because an employee's interest in freely moving from employer to employer is primarily a private interest beyond the protection provided by CEPA. Therefore, I would affirm.
Plaintiff founds her claim on N.J.S.A. 34:19-3c(3). This section provides that:
An employer shall not take any retaliatory action against an employee because the employee....
* * *
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

* * *
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
The threshold question in a CEPA claim brought under this section is whether plaintiff has identified "a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J.S.A. 34:19-3c(3); Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187-88, 707 A.2d 1000 (1998); Smith-Bozarth v. Coalition Against Rape and Abuse, Inc., 329 N.J.Super. 238, 244, 747 A.2d 322 (App.Div.2000). Sources of public policy include the federal and state constitutions, statutes, regulations, common law, judicial decisions and codes of ethics. MacDougall v. Weichert, 144 N.J. 380, 391, 677 A.2d 162 (1996). Whether a plaintiff has identified a clear mandate of public policy is a question of law to be decided by the court before submission of any CEPA case *119 to a jury. Mehlman, supra, 153 N.J. at 187, 707 A.2d 1000; Smith-Bozarth, supra, 329 N.J.Super. at 245, 747 A.2d 322. A policy which is vague, unsettled or controversial is not a clear mandate. MacDougall, supra, 144 N.J. at 392, 677 A.2d 162.
Plaintiff objected to her employer's decision to require her to execute a confidentiality and noncompetition agreement. A non-competition agreement is designed to protect the private interests of the employer. It is not per se illegal or contrary to public policy. It will be enforced if it protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public. Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 32-33, 274 A.2d 577 (1971); Solari Indus., Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970). Indeed, in Whitmyer, the Court observed that protection of trade secrets and other proprietary information is a legitimate interest of the employer and they have been protected by courts even in the absence of a noncompetition agreement. Whitmyer, supra, 58 N.J. at 33, 274 A.2d 577. The protection of customer relationships is also recognized as a legitimate employer interest. Ibid.
The public interest is usually identified as the public's right to foster fair commercial practices, to protect employers from theft of trade secrets or other proprietary information, and to discourage anti-competitive business activities. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 639, 542 A.2d 879 (1988). In certain situations, the public interest also includes the right of patients to continue a doctor-patient relationship upon the termination of the employment of a health care professional or the dissolution of a medical or dental practice. Karlin v. Weinberg, 77 N.J. 408, 424, 390 A.2d 1161 (1978). The patient's interest, however, may have to yield in whole or in part to private interests in certain situations. See Graziano v. Grant, 326 N.J.Super. 328, 344-45, 741 A.2d 156 (App.Div.1999) (a covenant not to compete ancillary to the sale of a medical practice may be entitled to broader protection than a covenant against competition in an employment agreement). This interest is obviously not implicated in this case.
Admittedly, an employment agreement which contains a non-competition agreement may be struck as unreasonable, Solari, supra, 55 N.J. at 576, 579, 264 A.2d 53; see also Ingersoll-Rand, supra, 110 N.J. at 643, 542 A.2d 879 (Court found employee invention holdover agreement was unreasonable and unenforceable where invention was not product of work done by former employee while employed at company nor incorporated company's trade secrets); it may be modified to achieve a reasonable agreement, Coskey's Television & Radio Sales & Serv., Inc. v. Foti, 253 N.J.Super. 626, 634, 602 A.2d 789 (App.Div.1992) (court modified overbroad agreement to preclude former employee from interfering with employer's successful contract bids that former employee had negotiated); or it may be enforced, Schuhalter v. Salerno, 279 N.J.Super. 504, 512, 653 A.2d 596 (App.Div.) (dissolving two partner accounting firm agreement restricting partners from servicing each other's clients for two years held reasonable and enforceable), certif. denied, 142 N.J. 454, 663 A.2d 1361 (1995). Whether a non-competition agreement will be enforced is a fact-sensitive inquiry. Graziano, supra, 326 N.J.Super. at 343, 741 A.2d 156. The need to assess each agreement individually to foster and protect the interests of the employer, employee and the public strongly suggests that an employee's objection to the fact of a noncompetition agreement and/or the specific terms of an agreement does not implicate CEPA because the employer's *120 actions do not transgress a clear mandate of public policy concerning the public health, safety or welfare.
The evolution of the law protecting employees from illegal or unethical employer conduct supports this view. Enacted in 1986, CEPA is designed to protect workers who are subjected to retaliation for reporting illegal, unlawful or unethical conduct. Barratt v. Cushman & Wakefield, 144 N.J. 120, 127, 675 A.2d 1094 (1996). The statute codified and elaborated on the rule announced in Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980), which recognized a tort action by an employee who suffers retaliatory action for refusing to perform an act in violation of a clear mandate of public policy.
In 1989, CEPA was amended to expand the protections provided to employees by prohibiting employers from taking retaliatory action against an employee who discloses or threatens to disclose any activity, policy or practice of an employer with whom the employee's employer has a business relationship. "The aim of the [amendment] is to discourage collusion between employers for the purpose of inhibiting disclosure by their employees of violations of law committed by either employer." Assembly Labor Committee Statement, Assembly No. 661, L. 1989, c. 220 § 1.[3]
Generally, "the purpose of CEPA is `to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.' " Mehlman, supra, 153 N.J. at 179, 707 A.2d 1000 (quoting Abbamont v. Piscataway Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994)); accord Barratt, supra, 144 N.J. at 127, 675 A.2d 1094. As remedial legislation, CEPA is to be construed liberally. Higgins v. Pascack Valley Hosp., 158 N.J. 404, 420, 730 A.2d 327 (1999). Nevertheless, a cause of action which provides a remedy for employees who are wrongfully discharged or who suffer other adverse employment consequences for objecting to employer conduct must balance the interests of the employee, the employer and the public. Pierce, supra, 84 N.J. at 71, 417 A.2d 505. In Pierce, the Court noted that
[e]mployees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

[Ibid.]
I do not interpret CEPA as disturbing this balance. Rather, CEPA recognizes and honors this balance by requiring that the employer's conduct must violate a clear mandate of public policy. In other words, in order to be subject to CEPA, the employer's conduct must implicate the public interest and pose a threat to the public health, safety and welfare.
The Court has stated that the scope of CEPA is not unlimited and that a helpful limiting principle is that the offensive conduct must implicate the public interest. Mehlman, supra, 153 N.J. at 187-88, 707 A.2d 1000. Justice Stein wrote:
The specific applications of the CEPA cause of action continue to evolve. But the core value that infuses CEPA is the legislative determination to protect from *121 retaliatory discharge those employees who, "believing that the public interest overrides the interest of the organization [they] serve[ ], publicly `blow[ ] the whistle' [because] the organization is involved in corrupt, illegal, fraudulent or harmful activity." Ralph Nader et al., Whistleblowing: The Report of the Conference on Professional Responsibility (1972). We look generally to the federal and state constitutions, statutes, administrative rules and decisions, judicial decisions, and professional codes of ethics to inform our determination whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy, but those sources are not necessarily exclusive. A salutary limiting principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee. See Littman [v. Firestone & Rubber Co.], [] 715 F.Supp. [90,] [] 93 [(S.D.N.Y.1989)]; Schwartz [v. Leasametric, Inc.], [] 224 N.J.Super. [21,] [] 30, 539 A.2d 744 [(App.Div.1988)]; Alexander [v. Kay Finlay Jewelers, Inc.], [] 208 N.J.Super. [503,] [ ] 508, 506 A.2d 379 [(App.Div.), certif. denied, 104 N.J. 466, 517 A.2d 449 (1986)].
[Ibid.]
Consistent with this principle, this court recently held that an employee's dispute with his employer concerning the allocation of overtime among employees did not state a claim under CEPA because the dispute concerns a personal harm rather than a public harm. Cosgrove v. Cranford Bd. of Educ., 356 N.J.Super. 518, 525, 813 A.2d 591 (App.Div.2003); see also Smith-Bozarth, supra, 329 N.J.Super. at 241, 747 A.2d 322 (discharge of case worker who refused agency director's request to review a patient's record did not invoke CEPA where no statute, rule, regulation or code of ethics precluded access of patient records by agency head). Moreover, in case after case in which the Court has held that CEPA was implicated by a retaliatory employment action, the affected employee disclosed information which directly effected the public interest.
In Barratt, a real estate broker was discharged for filing a report with the Real Estate Commission concerning past activities of another broker. Barratt, supra, 144 N.J. at 125, 675 A.2d 1094. The complaint led to the imposition of an administrative sanction. Id. at 131, 675 A.2d 1094. The Court recognized that the activity which was the subject of the complaint effected the public interest because real estate brokerage is heavily regulated and unethical or illegal conduct left unredressed subverts voluntary compliance with regulations and public confidence in real estate brokers. Ibid.
In Mehlman, the Court held that plaintiff's opposition to the use of benzene in excess of recommended levels in various grades of gasoline sold by a subsidiary of its employer in another country implicated the public interest because of the recognized public health, safety and welfare concerns of the substance. Mehlman, supra, 153 N.J. at 192, 707 A.2d 1000. In Abbamont, a teacher's complaint that shop practices in the school violated OSHA regulations implicated the public health, safety and welfare. Abbamont, supra, 138 N.J. at 425, 650 A.2d 958. In Higgins, a nurse's complaint about the actions of co-employees in a mobile intensive care unit implicated the public health, safety and welfare. Higgins, supra, 158 N.J. at 421, 730 A.2d 327. In Estate of Roach v. TRW, Inc., 164 N.J. 598, 613, 754 A.2d 544 (2000), the Court held that accusations that employees of a defense contractor engaged in fraudulent practices, such as arranging kickbacks and padding accounts, implicated *122 more than the private interests of the employer.
In order to determine whether plaintiff states a claim under CEPA, the initial focus is on the employer's "`activity, policy, or practice' that triggers the employee's objection or refusal to participate." N.J.S.A. 34:19-3c; Cosgrove, supra, 356 N.J.Super. at 525, 813 A.2d 591. In examining the employer's activity, we must remember that the CEPA standard of a "clear mandate of public policy" is designed to distinguish between legitimate practices, policies or actions fashioned to allow an employer to run its business in the manner best suited to accomplish its corporate purpose and protect its legitimate business interests, and illegitimate practices, policies and actions which are clearly recognized as incompatible with the public health, safety and welfare.[4]
Here, the dispute is essentially a private dispute between an employer and an employee. The dispute involves an attempt by the employer to protect business relationships and information belonging not only to the employer but also to clients. The employee has not been asked to do anything illegal or unethical. Plaintiff's complaint concerns a private harm rather than a public harm. Therefore, I would hold that the complaint fails to state a claim upon which relief can be granted and affirm the order dismissing the complaint.
NOTES
[1] Underlying the D'Sa decision is a California statute that, with certain exceptions, renders void any contract that purports to restrain a person from "engaging in a lawful profession, trade or business." Cal. Bus. and Prof.Code § 16600 (West 2003). Although New Jersey has no comparable statute, case law expresses the same policy against noncompete clauses that do not protect an employer's legitimate business interests.
[2] The issue was before the Court in Higgins v. Pascack Valley Hosp., 158 N.J. 404, 730 A.2d 327 (1999), but not specifically addressed. Instead, the Court dismissed the individual claims because the record did not "permit the entry of judgment against the individual defendants." Id. at 425, 730 A.2d 327.
[3] The statute was further amended in 1997 to address issues related to health care workers. L. 1997, c. 98 § 2. These amendments have been codified in N.J.S.A. 34:19-2f; 19-3a, b, c(1).
[4] D'Sa v. Playhut, Inc., 85 Cal.App.4th 927, 102 Cal.Rptr.2d 495 (2000) is not persuasive authority. The employment agreement in that case contained a very broad covenant not to compete partially if not wholly within the prohibitory provisions of a state statute, Cal. Bus. & Prof.Code § 16600, barring covenants not to compete. D'Sa, supra, 102 Cal.Rptr.2d at 498-99. This State does not have a similar legislative declaration of public policy.