**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1892-17T1

COMET MANAGEMENT
COMPANY, LLC,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

NICOLE WOOTEN, KATHLEEN
TRUMBLE, and ALLURE
PROPERTIES GROUP, LLC,

      Defendants-Appellants/
      Cross-Respondents.

_____

Argued December 10, 2019 – Decided February 25, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0740-14.

George T. Daggett argued the cause for appellant/cross-respondent.

Thomas N. Ryan argued the cause for respondent/cross-appellant (Laddey, Clark & Ryan, LLP, attorneys; Thomas N. Ryan and Jessica A. Jansyn, on the briefs).

PER CURIAM

Following a six-day jury trial, defendants Allure Properties Group, LLC, Nicole Wooten and Kathleen Trumble appeal a series of Law Division orders that culminated in an aggregate final judgment of $361,477.88, including counsel fees and costs of suit and pre-judgment interest. Defendants argue the motion judge erred by granting plaintiff's partial summary judgment motion on liability against Wooten and Trumble; dismissing Wooten's counterclaims for violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49; and denying reconsideration of those decisions. Defendants contend the trial judge erred by informing the jury of the motion judge's decisions establishing liability for breach of contract and breach of the duty of loyalty; and permitting the jury to consider plaintiff's claims for tortious interference with economic advantage and breach of the duty of loyalty. For the first time on appeal, defendants claim error with the jury instructions. Plaintiff Comet Management Company, LLC cross-appeals the portion of the final judgment that incorporated a prior order reducing its counsel fees and costs.

We have considered these arguments in light of the record and applicable legal standards. For the reasons that follow, we affirm all orders under review.

A-1892-17T1

I.

Initially, we address defendants' challenges to the motion judge's decisions on summary judgment, employing the same standard of review that governs the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). We must decide "whether the evidence present[ed] a sufficient disagreement to require submission to a jury or whether it [wa]s so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995); R. 4:46–2(c). In doing so, we view the facts from the record before the motion judge in a light most favorable to the non-moving defendants. Brill, 142 N.J. at 523. Those facts are essentially undisputed. Because Wooten's CEPA and LAD claims depend upon the timing of certain events, we set forth the facts in the following chronology in some detail.

A.

Plaintiff manages condominium and homeowners associations. Wooten was hired by plaintiff in 2003 as the company's office manager. In fewer than two years, Wooten's responsibilities expanded to property management, which included working closely with the associations' board members. In 2005, Wooten signed plaintiff's non-compete agreement. Among other things, Wooten agreed that "at any time during the period of employment and for a period of

A-1892-17T1

one year immediately following termination of [her] employment" she would not:

> A) Sell, solicit or accept business or orders from existing or newly acquired customers of [plaintiff] within a [twenty-five-]mile radius of any of [plaintiff's] offices which are currently maintained within Vernon Township and Hamburg Township, . . . located in Sussex County, . . . with respect to services that are similar to or competitive with [plaintiff] or any of its affiliates . . . . [or]

> B) Interfere with, disrupt or attempt to disrupt relationships, contractual or otherwise, between [plaintiff], including [its a]ffiliates, and its existing or newly acquired customers, employees or vendors.

The agreement permitted plaintiff to recover "any and all damages" plus counsel fees and expenses in the event of Wooten's breach.

In 2008, Wooten became plaintiff's vice-president. As a result of her promotion, Wooten received an increase in salary and a company car. Hired in 2009, Trumble became plaintiff's financial services manager, providing accounting services for plaintiff's clients that Wooten managed. Three of those clients are at issue here: Heritage Lakes at the Quarry Condominium Association, Inc., and Indian Fields at Hardyston Homeowners Association, Inc., both of which were located in Hamburg; and Hidden Village Condominium Association, Inc., which was located in Vernon.

4

By the end of 2012, plaintiff's then president began increasing his son-in-law's management duties; the son-in-law became plaintiff's president in early 2013. When deposed, Wooten said she was "stripped" of her title sometime in 2013; she could not recall the exact date. Notably, she said her responsibilities for plaintiff began to diminish by June or July 2013. Wooten's salary was not decreased.

In August 2013, Wooten complained to plaintiff's president that one of the company's maintenance workers, nicknamed Tennessee,[1] was living in an association's vacant unit without paying full rent. That unit was under rent receivership, the purpose of which is to reduce the association's delinquency rate. Wooten believed the president violated the rent-receivership "order" by permitting Tennessee to reside in the unit, which had an "excessive balance."

In October 2013, Wooten complained to the president that Tennessee was spreading an untrue rumor that she and Tennessee had engaged in a sexual encounter. Tennessee disclosed to the president a diametrically opposed version, claiming Tennessee and Wooten had, indeed, engaged in a sexual act. Following an internal investigation – which could not corroborate either account

---

[1] Wooten identified the employee by his full name. We use the employee's nickname to protect his privacy and because it is relevant to the issues on appeal.

A-1892-17T1

– the president implemented a written "plan of action" instructing Wooten and Tennessee to "stay away from each other and to stay away from the properties that either of them worked at." The following month, Tennessee was terminated for violating that mandate.

In December 2013, the president moved Wooten's office to the Indian Fields and Heritage Lakes properties because she "spen[t] most of [her] time there and ha[d] a very close touch with those boards and th[at] was always the plan with the new building at [another property]." The president's email to Wooten acknowledged the "little office area" at that location, but told Wooten she could use the conference room "anytime" she wanted to, and asked her to let him know if she thought she would be unable to make that change. In the same email, the president also advised Wooten that he intended to move Trumble into Wooten's office, and he would "set [him]self up in [Trumble's] office." Wooten asked the president why he intended to move Trumble, stating: "If you take from me[,] I don't care, my thoughts would be not to disrupt anyone else. I can sit in the conference room, but moving others, not sure about all of that . . . ."

While Wooten was physically moving to her new office location, the president gave her a bottle of Jack Daniel's Tennessee Whiskey. Wooten was offended because, as noted, Tennessee was the former maintenance worker's

A-1892-17T1

nickname. The president assured Wooten the liquor was intended as a holiday gift, which he had selected because he "recalled drinking Jack and Cokes with her husband . . . ." The president said he gifted other employees bottles of wine or liquor on that day, as he had done for the prior two or three years around the holidays. Shortly thereafter, Wooten and Trumble began discussing the formation of a community property management company that would provide similar services as plaintiff. They co-founded Allure for that purpose on January 31, 2014.

According to Wooten's deposition testimony, while still employed by plaintiff, she told Heritage Lakes she had started Allure. Dissatisfied with plaintiff's work, Heritage Lakes asked Wooten whether she knew anyone who could perform a "clean-out or something like that for a rent receiver [sic] unit." Wooten replied: "Sure, if you don't mind." Allure began performing maintenance work for Heritage Lakes on April 24, 2014. Wooten acknowledged that Allure issued several invoices to Heritage Lakes for services rendered from April through August 2014, which included dog waste collection, beach repairs, and maintenance. Allure provided the invoices to Heritage Lakes through plaintiff's "system."

A-1892-17T1

While she was still employed by plaintiff, Wooten also told Indian Fields she had started Allure, which performed a "clean-out" for that association in the Summer of 2014. Trumble "pretty much arranged it." Wooten claimed that work was not something plaintiff could have performed because "anything that [plaintiff] did was a catastrophe."

Wooten resigned from plaintiff's employ on August 27, 2014, effective two days later. In an email to the president she stated: "I am humble just because of my experiences working for [plaintiff]." On August 28, Heritage Lakes notified plaintiff it did not intend to renew its three-year contract, which expired on August 31. That same day, Trumble tendered her resignation, but stated she "would continue her employment through September 2014 . . . to facilitate the transition for [plaintiff]." Plaintiff claims it terminated Trumble on September 2, 2014 when the company "discovered [she] had met with Heritage Lakes to solicit its business on behalf of Allure . . . ." On September 2, Heritage Lakes retained Allure as its property management company.

Plaintiff's two-year contract with Hidden Village expired on June 30, 2013; the contract was renewed on a month-to-month basis thereafter. But, in October 2014, two of Hidden Village's board members approached Wooten, requesting Allure provide property management services for its association.

A-1892-17T1

Wooten claimed she had not told Hidden Village's board about Allure while she was employed by plaintiff. In January 2015, Hidden Village became Allure's client.

A few months after Wooten and Trumble resigned, plaintiff filed a ten-count verified complaint in the Law Division. Relevant here, plaintiff asserted claims for breach of contract against Wooten and Allure; breach of the duty of loyalty against Wooten, Trumble and Allure; and tortious interference with economic advantage against Wooten and Allure.[2] Plaintiff sought counsel fees and costs on each count of its complaint. Defendants collectively filed a verified answer; Wooten asserted counterclaims for violations of the CEPA and LAD, and plaintiff's internal harassment policy.

B.

Following discovery, the motion judge granted plaintiff's partial summary judgment motion on liability against Wooten for breach of contract and against Wooten and Trumble for breach of the duty of loyalty, and dismissing Wooten's

---

[2] For reasons that are unclear from the record, the jury returned a verdict against all three defendants, individually, for tortious interference with prospective economic advantage.

A-1892-17T1

counterclaims for CEPA and LAD violations.[3]  In a cogent statement of reasons accompanying the order, the motion judge squarely addressed the legal principles governing non-compete agreements and the duty of loyalty, concluding Wooten's non-compete agreement was valid and enforceable, and that she violated the agreement "by accepting business from Heritage Lakes, Hidden Village and Indian [Fields]."  The judge determined Allure, as a separate entity and a non-party to the agreement, was not jointly liable for Wooten's breach of contract.  The judge also concluded Wooten and Trumble breached their duties of loyalty by "actively engaging in competition with their current employer" by co-founding Allure while they were still employed by plaintiff and accepting business from plaintiff's clients.  Finally, the judge rejected Wooten's contention that plaintiff violated the CEPA or the LAD, or otherwise treated her unfairly to prevent enforcement of the covenant not to compete.

---

[3]  Although the motion judge's written decision thoroughly sets forth his reasons for denying Wooten's CEPA and LAD claims, the accompanying orders granting partial summary judgment do not include dismissal of those claims, or that Wooten's common law claim was still viable.  The order denying reconsideration generally refers to the statement of reasons, which again rejected Wooten's CEPA and LAD claims.  Prior to jury selection, the trial judge memorialized an off-the-record conference held in chambers stating:  "[T]he parties agree that all the counterclaims have been dismissed by [the motion judge]."

A-1892-17T1

On appeal, defendants primarily contend the motion judge erroneously determined Wooten violated the non-compete agreement by "accepting" business from plaintiff's former clients.  Because Heritage Lakes and Hidden Village had ended their contracts with plaintiff before those associations became Allure's clients, defendants claim the non-compete agreement's "[p]rohibition against 'acceptance' is contrary to case law and against public policy."  In a somewhat overlapping argument, defendants contend the motion judge failed to apply the governing law to plaintiff's breach of the duty of loyalty claims.  Defendants argue the judge failed to consider that the associations had been dissatisfied with plaintiff's work, positing plaintiff derived a benefit from the work performed by Allure because plaintiff "wasn't immediately terminated" by the associations.  Defendants contentions are misplaced.  We address those contentions in reverse order.

1.

Contract or no contract, employees owe an "undivided loyalty" to their employers "while [they are] still employed."  Auxton Comput. Enters., Inc. v. Parker, 174 N.J. Super. 418, 423-24 (App. Div. 1980).  If an employee is not subject to a non-compete agreement, he "may anticipate the future termination of his employment and, while still employed, make arrangements for some new

A-1892-17T1

employment by a competitor or the establishment of his own business in competition with his employer." Id. at 423. "The mere planning, without more, is not a breach of an employee's duty of loyalty and good faith to his employer." Id. at 424. But, an employee "may not solicit his employer's customers for his own benefit before he has terminated his employment," and an employee may not "do other similar acts in direct competition with the employer's business," or "contrary to the employer's interests" while still employed. Id. at 423, 425; accord Chernow v. Reyes, 239 N.J. Super. 201, 202 (App. Div. 1990).

In Cameco, Inc. v. Gedicke, 157 N.J. 504, 516 (1999), our Supreme Court recognized that a breach of loyalty claim generally requires a fact-specific analysis, explaining "[t]he scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks." Generally, "the adjudication of such claims summons rules of reason and fairness." Ibid. To guide trial courts, the Court later identified four factors relevant to the determination of whether an employee-agent breaches the duty of loyalty:

> (1) The existence of contractual provisions relevant to the employee's actions; (2) the employer's knowledge of, or agreement to, the employee's actions; (3) the status of the employee and his or her relationship to the

employer, e.g., corporate officer or director versus production line worker; and (4) the nature of the employee's [conduct] and its effect on the employer.

[Kaye v. Rosefielde, 223 N.J. 218, 230 (2015) (internal quotation marks omitted).]

As the motion judge correctly concluded, "Wooten and Trumble breached the duty of loyalty when they accepted business and were in competition with [p]laintiff, while still employed by [p]laintiff." According to Trumble's deposition, plaintiff had no knowledge of Allure while Wooten and Trumble were still employees. Both defendants held high-level management positions while employed by plaintiff. Further, the non-compete agreement prohibited Wooten from "accept[ing] business" from plaintiff's clients "during the period of employment." We are therefore satisfied that the conduct of Wooten and Trumble "went beyond making arrangements for the future and [they] were actively engaging in competition," thereby breaching their duty of loyalty to plaintiff. We also are satisfied that Wooten breached the non-compete agreement by accepting business from Heritage Lakes and Indian Fields while she was still employed by plaintiff.

2.

Defendants' primary challenge to the non-compete agreement is grounded in public policy concerns. They also claim plaintiff mistreated Wooten, thereby

rendering the non-compete provision unenforceable. Defendants do not otherwise challenge the reasonableness of the agreement's restrictions.

Initially, we note the non-compete agreement signed by Wooten prohibited competition both during and for one year after her employment with plaintiff ended. The undisputed facts established Wooten breached the agreement by competing with plaintiff while she was still employed by plaintiff. Wooten notified Hidden Village, Indian Fields and Heritage Lakes that she had started her own company when those associations still had effective management agreements with plaintiff. Allure began performing services for two of those clients before they had terminated their business relationships with plaintiff.

Moreover, the restrictive covenant was reasonable. A non-compete agreement is enforceable if it satisfies the test for reasonableness set forth in Karlin v. Weinberg, 77 N.J. 408 (1978), as reaffirmed in Community Hospital Group, Inc. v. More, 183 N.J. 36, 57 (2005), and Pierson v. Medical Health Centers, P.A., 183 N.J. 65, 69 (2005). The Karlin test, also known as the Solari or Solari/Whitmyer test,[4] requires the court to determine whether: "(1) the

---

[4] Solari Indus., Inc. v. Malady, 55 N.J. 571 (1970); Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25 (1971).

restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public." Cmty. Hosp. Grp., Inc., 183 N.J. at 57. Courts should also consider three other factors "in determining whether the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited. Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." Id. at 58. Ultimately, a court must assess an agreement's reasonableness on a case-by-case basis. Pierson, 183 N.J. at 69.

Defendants claim the non-compete agreement fails to satisfy the third Karlin factor, suggesting a restrictive covenant that prevents a former employee from "accepting" business from her prior employer's former clients should be declared void as against public policy. In A.T. Hudson & Co. v. Donovan, 216 N.J. Super. 426, 432-33 (App. Div. 1987), we determined an employer's interest in protecting customer relationships outweighed the public's interest in "an unrestricted choice of management consultants." We distinguished the commercial services rendered by a management consultant from the professional services rendered by an attorney to a client, a doctor to a patient or an accountant to a client. Id. at 433-34.

Weighing "the competing interest of the customers against plaintiff's business interest," the motion record here is devoid of any evidence that a one-year, twenty-five-mile restriction on providing property management services to plaintiff's existing or newly acquired clients was unreasonably injurious to the public. See id. at 433. As the motion judge explained, "[a]bsent from the record before the [c]ourt [we]re any certifications on behalf of [d]efendants certifying that enforcement of the covenant would restrict the public's access to other qualified property managers within the [twenty-five-mile] area." The judge elaborated:

> Similarly, absent is evidence in the record showing any undue burden on finding customers from the twenty-five-mile radius restriction. Defendant Wooten is a property manager and her services to the public are in [a] for-profit, commercial context. Unlike the lawyers in Dwyer [v. Jung, 133 N.J. Super. 343 (Ch. Div. 1975), aff'd, 137 N.J. Super. 135 (App. Div. 1975)], or the doctors in [Community Hospital Grp., Inc.], a property manager does not stand in a special relationship to the public [footnote omitted]. Accordingly, there is no negative impact on the public interest.

We agree with the motion judge that defendants failed to support their claim and that their argument lacks merit. In reaching our conclusion, we reject defendants' reliance on the Chancery court's observation in Mailman, Ross, Toyes & Shapiro v. Edelson, 183 N.J. Super. 434, 442 (Ch. Div. 1982), that "a

16

covenant which attempts to 'protect' the clients from contact with the former employee operates to restrict the solicitation rights of the public[,]" thereby binding "those who were never parties to the agreement."

More than two decades ago, we explained our discord with Mailman's implication that "covenants restricting professionals in their practice are necessarily so 'injurious to the public' that they should rarely, if ever, be enforced." Schuhalter v. Salerno, 279 N.J. Super. 504, 511 (App. Div. 1995). Indeed, we rejected a categorical "assertion of invalidity of restrictive covenants that 'impinge on the public's right to free access to the professional of its choice,'" the same type of categorical rule for which defendants now advocate. Id. at 512. Adopting that sort of bright-line approach would contravene our Supreme Court's mandate that non-compete agreements be assessed on a case-by-case basis. Pierson, 183 N.J. at 69.

Notably, unlike here, the non-compete agreement in Mailman prohibited a certified public accountant from "accept[ing], solicit[ing] or offer[ing] accounting services" to his employer's clients for a two-year period following his termination. 183 N.J. Super. at 436. After resigning from his position, the employee accepted employment from one of his former employer's clients. Id. at 437. Applying the Solari test, the Chancery court denied injunctive relief to

the employer.  Id. at 442.  But, unlike Wooten, the employee in Mailman "accepted employment from a client[,] which had already terminated its relationship with [the employer] before seeking out [the employee's] services." Id. at 441 (emphasis added).  Further, unlike here, the non-compete agreement at issue in Mailman entirely lacked a territorial limitation, which served as a "pure restriction on competition."  Ibid.

Given the focus of defendants' argument, we need not review the remaining Karlin factors.  For the sake of completeness, we observe – as did the motion judge – that plaintiff's management agreements generally exceeded one year in duration, therefore the covenant's one-year restriction was "consistent with [p]laintiff's interests in protecting its client relationships . . . ."  Further, as the property manager for each of the three properties, Wooten had "substantial dealings" with plaintiff's clients.  See Solari, 55 N.J. at 586 (suggesting that following a remand hearing, a one-year limitation on an employee may be appropriate for actual or prospective customers with whom the employee had "substantial dealings" during his employment).

Regarding the "undue hardship" factor, the Court has recognized, "where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should

be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself." Karlin, 77 N.J at 423-24; see also Cmty. Hosp. Grp., Inc., 183 N.J. at 102 ("If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

As the motion judge noted, Wooten "voluntarily left her employment relationship with [p]laintiff" in August 2014 and became Allure's property manager. Importantly, Wooten's non-compete agreement did not prevent her from providing property management services entirely, and as such, her ability to earn a living was not impaired. For example, Wooten acknowledged Allure provided management services to associations other than plaintiff's clients, including associations located in Nutley and Toms River. We agree with the motion judge that the record before him was devoid of evidence "showing any undue burden on finding customers from the twenty-five-mile radius restriction."

Defendants' contention that Wooten's alleged unfair treatment by plaintiff somehow voided the non-compete provision lacks sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E). We simply add defendants' reliance on Solari is misplaced. Unlike the defendant in that case,

Wooten never "expressed the thought that she was being deliberately forced out" nor did plaintiff terminate her employment. Solari, 55 N.J. at 573.

3.

We also find no merit in Wooten's contention that the motion judge erroneously dismissed her CEPA and LAD counterclaims. She argues the judge misunderstood the relevance of her move to a closet-sized office without a desk, chairs or a telephone, and the insulting gift of whiskey that bore Tennessee's nickname. She claims the president took those "adverse actions" in retaliation for her reporting Tennessee's unlawful living arrangements and his false rumor-spreading, causing her constructive discharge and thereby violating the LAD and CEPA. Wooten's argument is unavailing.

To establish a prima facie CEPA claim, the employee must prove

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

20

[<u>Dzwonar v. McDevitt</u>, 177 N.J. 451, 462 (2003).]

Relevant here, CEPA prohibits an employer from taking "retaliatory action" against an employee for protected whistleblower conduct. N.J.S.A. 34:19-3. "Retaliatory action" is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

> What constitutes an "adverse employment action" must be viewed in light of the broad remedial purpose of CEPA, and our charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit or unethical activities. Cast in that light, an "adverse employment action" is taken against an employee engaged in protected activity when an employer targets him for reprisals – making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations – causing the employee to suffer a mental breakdown and rendering him unfit for continued employment.
>
> [<u>Donelson v. DuPont Chambers Works</u>, 206 N.J. 243, 257-58 (2011).]

By reporting what she perceived to be Tennessee's unlawful occupancy of the rent-receivership unit, Wooten presented sufficient evidence that she engaged in protected whistleblowing activity. But, Wooten failed to demonstrate plaintiff demoted, suspended or discharged her, reduced her rank

or compensation, or constructively discharged her in response to that whistleblowing activity. Maimone v. City of Atlantic City, 188 N.J. 221, 236 (2006). Indeed, as Wooten candidly acknowledged, she could not recall when she was allegedly demoted, she never received a pay-cut, and her responsibilities began to diminish in June or July 2013 before she reported Tennessee's unlawful conduct in August 2013 and rumor-spreading in October 2013.

We agree with the motion judge's determination that Wooten's office relocation and the gifting of "Tennessee" whiskey did not constitute adverse employment action under the CEPA. See Shepard v. Hunterdon Dev. Ctr., 336 N.J. Super. 395, 416 (App. Div. 2001) ("Neither rudeness nor lack of sensitivity alone constitutes harassment, and simple teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of one's employment."), aff'd in relevant part, 174 N.J. 1 (2002). As the motion judge recognized, the president testified that every year around Christmas, he "gave all employees either a bottle of wine or some type of gift as a thank-you." The president also relocated Trumble's office on the same day that he relocated Wooten's. We therefore discern no error in the judge's decision dismissing Wooten's CEPA claim.

Defendants rely upon the same conduct to support Wooten's LAD claim. Because "[i]t is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim,"[5] <u>Donofry v. Autotote Sys., Inc.</u>, 350 N.J. Super. 276, 290 (App. Div. 2001), we find Wooten's LAD claims are without sufficient merit to warrant discussion in our written opinion. <u>R.</u> 2:11-3(e)(1)(E). We affirm the judge's dismissal of those claims for the reasons expressed by the motion judge.

## II.

We have considered defendants' challenges to the trial judge's decisions and find them equally meritless. Accordingly, we affirm those decisions without discussion, <u>ibid.</u>, other than to note defense counsel acknowledged the judge's preliminary statement to the jurors – informing them liability had been established and was not an issue before them – was "acceptable" to defendants; defense counsel did not request a jury instruction regarding the lack of evidence that defendants "solicited" plaintiff's clients; and the claims of breach of the duty

---

[5] Under the LAD, a claimant must demonstrate: (1) the employee was in a protected class; (2) the employee engaged in protected activity known to the employer; (3) the employee was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence. <u>Woods-Pirozzi v. Nabisco Foods</u>, 290 N.J. Super. 252, 266, 274 (App. Div. 1996).

of loyalty and tortious interference with economic advantage are cognizable in a single action.  See Lamorte Burns & Co. v. Walters, 167 N.J. 285, 309 (2001).

## III.

On its cross-appeal, plaintiff contends the trial judge erroneously reduced its fee and cost award.  Plaintiff renews its argument that the work its counsel performed in litigating its three claims – breach of the non-compete agreement, breach of the duty of loyalty, and interference with prospective economic advantage – cannot be differentiated.  Accordingly, plaintiff contends it is entitled to fees and costs for all the work performed.  Notably, defendants have not addressed plaintiff's cross-appeal.

It is well-settled that reviewing courts will disturb a trial court's fee award "only on the rarest of occasions, and then only because of a clear abuse of discretion."  Rendine v. Pantzer, 141 N.J. 292, 317 (1995); see also Litton Indus. v. IMO Indus., 200 N.J. 372, 386 (2009); Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001).  "Where the lower court's determination of fees was based on irrelevant or inappropriate factors, or amounts to a clear error in judgment, the reviewing court should intervene."  Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 155-56 (App. Div. 2016).

A-1892-17T1

Recognizing our jurisprudence "generally disfavors the shifting of attorneys' fees, [but] a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract," Packard-Bamberger, 167 N.J. at 440, the trial judge limited plaintiff's fee award to its breach of contract claim because the non-compete agreement expressly provided for fees in the event of a breach. The judge elaborated:

> [B]ecause only one of the three issues, the breach of contract claim, has a basis to recover attorney[s'] fees, the court will calculate these costs by dividing the costs by three, and providing one[-]third of the fees and costs for the breach of contract claim. The court concurs that the time is not broken down in the time slips because the three claims are intertwined. The court has reviewed the factors set forth in [the Rules of Professional Conduct (RPC)] 1.5[6] and finds the fees as

---

[6] RPC 1.5(a) delineates the factors to be considered by the court in determining the reasonableness of counsel fees:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;

submitted are reasonable and the hourly rates are reasonable. The court also finds that allocating attorney[s' fees] equally between the affirmative claims and the counterclaims . . . is reasonable and appropriate based on the court's review of the billing.

Citing our decision in <u>Silva v. Autos of Amboy, Inc.</u>, 267 N.J. Super. 546 (App. Div. 1993), which applied the United States Supreme Court's decision in <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983), plaintiff argues that precedent precludes the approach utilized by the trial judge. We disagree.

In <u>Silva</u>, we observed that when a plaintiff presents claims for which fees are permitted by statute along with claims for which such fees cannot be awarded, attorneys' fees for all of the time devoted by counsel to the case can be awarded if the work on the unrelated claims "can[] be deemed in pursuit of the ultimate result achieved." 267 N.J. Super. at 556 (citing <u>Hensley</u>, 461 U.S. at 434-35). A suit will not be considered a collection of separate discrete claims

---

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

if it rests on "a common core of facts" or is "based on related legal theories." Ibid. (internal quotation marks omitted) (quoting Hensley, 461 U.S. at 435).

We are persuaded the judge reasonably reduced plaintiff's award by two-thirds because Wooten's breach of the non-compete agreement primarily involved Wooten's actions while she was employed by plaintiff, while its claims for unlawful interference with prospective business advantage pertained to the conduct by Wooten, Trumble, and Allure after both individuals resigned from plaintiff's employment. In that regard, the trial judge's decision tracks our direction in Silva – that when the same core facts are relevant to claims for which fees are to be awarded and other claims – "the court must focus on the 'significance of the overall relief obtained . . . in relation to the hours reasonably expended on the litigation.'" 267 N.J. Super. at 556 (quoting Hensley, 461 U.S. at 435). Because the "significance" of plaintiff's relief obtained for its breach of contract claim, i.e., $93,928.31 – which was expressly permitted under the non-compete agreement – was much less when compared with the significance of its non-contractual claims, i.e., $187,856.62 for the unlawful interference with prospective business advantage, and an aggregate $19,705.68 for its breach of the duty of loyalty claims, we conclude the judge's award was reasonable.

A-1892-17T1

Moreover, we have observed: "In fixing counsel fees, a trial judge must ensure that the award does not cover effort expended on independent claims that happen to be joined with claims for which counsel is entitled to attorney fees." Grubbs v. Knoll, 376 N.J. Super. 420, 431 (App. Div. 2005); see also Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 614 (App. Div. 1990) (holding the court must consider plaintiff succeeded on two claims that did not provide for counsel fees when awarding fees on the third claim), aff'd o.b., 124 N.J. 520 (1991). Accordingly, we discern no error in the judge's fee award in the present case, which reasonably distinguished the work plaintiff's counsel performed in connection with its breach of contract claim from the other work performed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1892-17T1